[No. 927.  Decided January 15, 1894.]

D. O. PARMETER, *Appellant*, v. J. F. BOURNE *et al.*, *Respondents.*

REMOVAL OF COUNTY SEAT—FRAUDULENT ELECTION—JURISDICTION OF COURT—RIGHT OF ACTION—INTEREST OF PRIVATE CITIZEN.

The superior court has no jurisdiction of the subject matter of an action which seeks to enjoin the removal of a county seat on the ground of fraud committed in the election therefor. (STILES and HOYT, JJ., dissent.)

A private citizen, although a taxpayer, has no such property interest in the location of a county seat as will give him a right of action to contest its removal. (STILES and HOYT, JJ., dissent.)

*Appeal from Superior Court, Pacific County.*

*Fulton Bros.,* for appellant.

*R. K. Boney, Crowley & Sullivan,* and *Marion D. Egbert,* for respondents.

The opinion of the court was delivered by

DUNBAR, C. J.—At the general election held November 8, 1892, there was submitted, by order of the county com-

missioners, to the electors of Pacific county, a proposition
to remove the county seat of that county from the town of
Oysterville, where it had been established for a number of
years, to the town of South Bend, or to the town of Sea-
land.    On November 18, 1892, the board of county com-
missioners canvassed the votes on that proposition, and
ascertained from the poll books that 1,469 votes were cast
on the proposition; that the town of South Bend received
984, the town of Sealand 376, and the town of Oysterville
109.    The town of South Bend was thereupon declared
to be the county seat of Pacific county, and an order was
made requiring the public records and archives of the
county to be moved to South Bend on or before the 4th
day of February, 1893.

Appellant, a citizen and taxpayer of Oysterville, brought
this action to set aside and vacate the order of the county
commissioners of Pacific county declaring South Bend to
be the county seat of Pacific county from and after the
4th day of February, 1893, and asked for an injunction
to enjoin and restrain the defendants, and each of them,
and their successors in office, from removing from the
county building, or county offices, or from the town of
Oysterville, any of the archives, public records, or any
books whatever, or any property whatever, or any records
whatever, to the town of South Bend, or elsewhere, and
that they be restrained from attempting to remove any
such records or archives, etc.    The defendants demurred
to the complaint, alleging, among other things, that the
court had no jurisdiction of the subject matter of the ac-
tion; that the complaint did not state facts sufficient to
constitute a cause of action as to said defendants, or any
of them; that plaintiff had no legal authority to sue in said
action; and that the court had no jurisdiction of the per-
sons of the defendants.    The demurrer was sustained by
the court on the ground that it had no jurisdiction of the

subject matter of the action.   The complaint alleges fraud in the counting of the votes by the judges of election, and in issuing fraudulent returns to the board of county commissioners of such election.

It is conceded that there is no provision made under the special law for the removal of county seats for a contest in case of illegal voting, unless there be a right of appeal from the action of the county commissioners in canvassing the votes.   It is insisted by the appellant, that in this instance, if the law would warrant such an appeal, it would be absolutely ineffectual.   With the view we take of the law it is not necessary to pass upon the question of the right of appeal in this character of a case.   The statement of facts set up in the complaint appeals to us very strongly for relief, and shows an aggravated case of perverting the election laws, and thwarting the will of the voters, and had we the authority we would gladly place the parties upon the proof of their allegations.   But, from an investigation of the law involving the origin, the history of, and the jurisdiction of courts of equity, we are forced to the conclusion that the court has no jurisdiction over this case; and, lamentable as it may be, that the voter is left remediless to have his vote counted for the place of his choice, it would be still more lamentable for a court, which is but a creature of the law, to assume jurisdiction which is not conferred upon it by law, or to usurp the functions of those tribunals in which the lawmaking power has reposed confidence, and upon which it has imposed discretionary powers over the subject matter.

A court of equity is not entirely a free lance which can be wielded independently of law or regulation.   It is just as subservient to, and dependent on, the law so far as its jurisdiction is concerned as is a court of law.   It is true that the rules governing the administration of law, and of enforcing and protecting rights under the law as applied

by courts of equity, are more pliable and adaptive than are the rules governing courts of law.   The object of the establishment of courts of equity was to escape the rigidity of the rules governing cases of law, and to confer more discretionary powers upon the chancellor, thereby making the administration of the law more flexible and more effective for the elicitation of truth; and these flexible principles, or rules, which characterize the proceedings in equity, are usually applicable to the investigation of cases where fraud is involved, and for that reason such cases are assigned to the equity jurisdiction.

For this reason loose expressions are sometimes indulged in, to the effect that "it is one of the inherent powers of a court of equity to correct fraud."   This proposition is no doubt true as applied to the powers of a court having jurisdiction of the subject matter in which the fraud is involved; but it no more follows that the mere suggestion of fraud gives a court of equity jurisdiction, than that the suggestion of the deprivation of a legal right gives a court of law jurisdiction where the law has provided no remedy or no tribunal to enforce the right.   This discrimination must not be lost sight of, viz., the difference between the jurisdiction, and the extended powers of the court under its jurisdiction.

There was a much wider distinction between the jurisdiction of courts of equity and law in ancient times than there is at present.

"The court of chancery," says Pomeroy, Eq. Jur., §§ 34, 35, "as a regular tribunal for the administering of equitable relief and extraordinary remedies, is usually spoken of as dating from this decree of King Edward III; but it is certain that the royal action was merely confirmatory of a process which had gone on through many preceding years.   The delegation made by this order of the king conferred a general authority to give relief in all matters, of what nature soever, requiring the exercise of

the prerogative of grace. This authority differed wholly from that upon which the jurisdiction of the law courts was based. These latter tribunals acquired jurisdiction in each case which came before them, by virtue of a delegation from the crown, contained in the particular writ on which the case was founded, and a writ for that purpose could only be issued in cases provided for by the positive rules of the common law. This was one of the fundamental distinctions between the jurisdiction of the English common law courts, under their ancient organization, and that of the English court of chancery. This distinction," says the author, "has never existed in the United States. The highest courts of law and of equity, both state and national, derive their jurisdiction either from 'the constitutions or from the statutes.''

And especially has this distinction, so far as inherent powers are concerned, been destroyed in this state by our statute, which provides that there shall be but one form of action in this state hereafter for the enforcement or protection of private rights and the redress of private wrongs, which shall be called a civil action. As a conclusive proof that the correction of fraud under all circumstances is not an inherent power of a court of equity, it is universally conceded that under our form of government neither courts of equity nor law have jurisdiction over political questions which do not involve the rights of private parties; that in such cases the will of the legislature is supreme, and that the contentions arising in such cases must be settled by the tribunals created by the legislature for that purpose, and that if the legislature has provided no remedy for grievances that may be engendered under such laws, it is simply a *casus omissus*, and no remedy can be obtained. The administration of the law is full of such discoveries as these, and as unfortunate as they may be, they furnish no good grounds for an unlawful assumption of authority by the court. So we say, by reason of this universal concession the doctrine of inherent power is destroyed, whether this

4—8 WASH.

prove to be a political question or not. And it seems to us that the removal of a county seat is so essentially and purely a political question that the mere statement of the proposition ought to excuse any further argument.

And so with the further proposition that the plaintiff in this case has no property interest in the suit, which it seems to us is a necessary corollary to the first proposition; for no person can have a property right in a county seat if the removal of the county seat is a political question. The contrary conclusion, if carried into effect, would involve a judicial mixing of rights and remedies that would be incongruous, and little less than ludicrous. In the very nature of things, a person can have no private interest in the location of a county seat. If he has, what does the interest consist of? How can it be shown, and its extent determined? What is the measure of damages? An attempt to answer these questions will show the fallacy of the position.

It is urged that he has a right to vote and to have his vote counted. The right to vote is not a natural right, nor is it an absolutely unqualified personal right. It is a right derived in this country from constitutions and statutes. McCrary on Elections, § 11.

His right to vote, then, in this case, was a right conferred by the same statute which provided how the vote should be counted. All the right he had was derived from the statute. It was no broader than the statute, and if the statute has attempted to confer upon him a right, and failed by reason of its imperfection in the way of prescribing remedies, it is simply his political misfortune, and the only relief is in remedial legislation. The authorities, we think, overwhelmingly sustain these propositions, and we will consider them together.

"In the absence of constitutional inhibitions, the legislature has power to declare the certificate of election con-

clusive, in all cases.   It may or may not authorize a
contest.   If a contest be authorized, the mode of contest
and of trial will rest absolutely in the legislative discretion.
The legislature has full power to determine what tribunal
shall hear and determine the contest, and may confer the
jurisdiction upon one of the ordinary judicial tribunals, or
upon a judge thereof, or upon any other officer, and may,
or may not, authorize a trial by jury." Paine, Law of
Elections, § 793.

"Unless specially authorized by statute, a court of
chancery has no power to enjoin the holding of an election.
.   .   .   The doctrine announced is, that courts of equity
have no inherent power to try contested elections, and can
only exercise such power where it has been conferred by
express enactment, or necessary implication therefrom."
McCrary on Elections, § 351.

Canvass of the board to determine the result of an elec-
tion held by order of the board of supervisors by a two-
thirds vote of a county, at a meeting in which all the
towns were represented, for the purpose of determining
the location of the county seat, is conclusive.   *Hipp v.
Supervisors*, 62 Mich. 456 (29 N. W. 77).

It does not appear from the report of this case whether
there was any question of fraud involved, but we must con-
clude from the language of the court that it would not have
made any difference in the disposition of the case, but that
it was decided upon the broad ground that it was not a
judicial question.   Chief Justice CAMPBELL, in delivering
the opinion, says:

"The questions are not such as the courts have any
right to disturb after they have been disposed of by the
only authority which the law has empowered to act upon
them.   The supervisors, at a meeting when all the towns
were represented, by a two-thirds vote, ordered an election
to determine upon the proposed removal of the county
seat.   This election was held, and the board determined
the result upon a canvass.   That action is conclusive, and
no authority exists anywhere to dispute it.   The contro-

versy, which is not in any proper sense a judicial one, is closed.    The constitution has not empowered this court to settle controversies not judicial, which are very wisely left to the proper local and representative agencies of the people.''

It is argued in this case that there is no discretion vested in the board of county commissioners, but whether that be true or not, it makes no difference in principle whether the discretion was vested in the board of county commissioners or in the judges and inspector of the election.    The legislature would have power to invest the discretion in either tribunal, and under our constitution they had invested the discretion and entrusted the board, consisting of the judges and inspector of the precincts, with the power to canvass the votes of the precinct, prepare the returns, and transmit them to the county commissioners; and the county commissioners have been entrusted with the power to canvass the vote as returned by the different election boards, and declare the result; and it can make no difference in principle if the legislature has seen fit to invest different tribunals with discretionary power.

''In the absence of statutory authorization, the courts are without jurisdiction, *ratione materiæ*, to entertain the case of a contested election, and the consent of parties cannot give them jurisdiction.'' *State v. Judge of Second Judicial District*, 13 La. An. 89.

This is not a county seat case, but involves the question of judicial jurisdiction.    In that case the court said:

''The contesting of votes is not a judicial function, only so far as made such by special statutes.    Indeed, some may have gone so far as to question whether this is not wholly a matter of administration which cannot with propriety be referred to the judicial tribunals at all.    At any rate it is clear that such tribunals cannot usurp any greater control over this business than is specially imposed upon them by law.    In the absence of a statutory authorization, they are without jurisdiction of the matter, *ratione materiæ*.    The

consent of parties cannot give jurisdiction, and all courts before whom such an unauthorized controversy is brought must decline, *ex officio*, to render any order which would recognize a right to sustain the case.''

In *State v. Police Jury*, 41 La. An. 850 (6 South. 777), the doctrine announced in the case of *State v. Judge of Second Judicial District*, *supra*, was affirmed. · This was a parish suit case, and the court, among other things, said:

''It seems well settled that, in absence of express statutory authority, courts of equity will not exercise such jurisdiction. . . . It is ancient, and it has been at all times within the power of the legislature to extend to the courts the jurisdiction which they had declined. The fact that the legislature has not done so, or has extended only a jurisdiction defined and limited, clearly conveys the intention of the department to exclude the courts from any jurisdiction in such matters beyond that expressly granted. Indeed, the assumption of such jurisdiction, in absence of any legislative regulations of method, time and order of procedure, would be fraught with serious consequences. . . . There is no possible reason or consideration for applying a different rule to elections for parish seats from that applied to elections for officers. Both are matters of purely governmental concern, involving only public and popular rights and conferring no private rights which are susceptible of becoming vested.''

*Skrine v. Jackson*, 73 Ga. 377, involved the contest of an election on a fence law. It was decided that that was a part of the political power of the state which the legislature had seen fit to confer upon the ordinary, and the courts had no authority to interfere.

''There are but two modes,'' said the court, ''by which the legality of an election may be inquired into—by the common law and by statute. By the common law an information in the nature of a writ of quo warranto was exhibited by the state, upon the relation of some person claiming the office said to be usurped by the defendant, and he was required to show by what authority he held

the office.    The legality of his election might be inquired
into by this proceeding.''    [And some reference is made
to the Georgia code.]    ''It is quite clear that such a pro-
ceeding is not applicable to the present case.    There is no
office, and there is no person claiming an office, and no per-
son exercising an office, but simply a law is declared
adopted, which provides for the future that no fence need
be used by the citizens of Richmond county.    Is there any
statute of force in this state, other than has already been
referred to, which authorizes the courts to inquire into the
legality of this election?    None has been pointed out to
us, and we have failed to find any.    Then, if the remedies
provided by the common law fail, and no statutory remedy
be provided, is not the presumption conclusive that the
legislature did not intend to have judicial interference in
this matter, but to leave it to the determination of the
ordinary, as provided in the act?''

In *Freeman v. State, ex rel. McDonald*, 72 Ga. 812, it
was decided that the legislature could provide a tribunal
for the determination of contested elections and that such
determination was final and conclusive.

*Clarke v. Jack*, 60 Ala. 271, was a county seat case, and
it was decided that an act to authorize the people of a par-
ticular county to vote on the question of removing the
county seat, and to permanently locate the same according
to their vote, is not a special or local law for the benefit of
individuals or a corporation, and that the provisions of the
general election law regulating contested elections did not
apply to county seat elections, and did not amount to a
statutory provision for a contest of such election.

In *Harrell v. Lynch*, 65 Tex. 146, it was decided that
voters in a county have in the location of a county seat no
such interest as will form the basis of a suit.    Said the
court:

''As no man has a property right in the location of the
county seat, its unlawful removal (no more than a trespass
upon the court yard) gives him no cause of action. . Being

deprived of no right, the depreciation in the value of his property is not a wrong for which a court of equity, in the absence of a legal remedy, would invent the means of redress. A valid law authorized the election, the election has been held, the agents appointed to ascertain and declare the result have performed that duty. This accomplishes the fact, and the law here ends the controversy. If a wrong has been done, the usurpation of the power to prescribe a remedy would be a still greater wrong.''

*Sanders v. Metcalf,* 1 Tenn. Ch. 419, is a case involving the removal of a county seat. The court said:

''It is clear to my mind that the legislature has, by this language, entrusted to the county court at its quarterly session, as the proper organ of the county, as a *quasi* corporation, the right to count the votes and declare the result. . . . As soon as the result was declared, the county seat was *eo instanti* changed, as if it had been done by an act of the legislature. The county court were commissioners appointed by the legislature to make the removal by declaring the result of the election, and their act, not being judicial but legislative, is conclusive, and the courts have no power to inquire into its validity.''

In *McWhirter v. Brainard,* 5 Or. 426, it was held that, upon the submission of the question of the location of a county seat to an election, the question of fact as to whether the canvass of the vote was correct, and as to what the true vote was, and subordinate questions, cannot be tried in equity.

In *Attorney General v. Supervisors of Lake County,* 33 Mich. 289, it was decided that the question of the removal of a county seat is purely a political question, and does not in any way legally involve the rights of private parties.

There is no distinction made in the cases between cases where fraud is alleged, and where it is not alleged. They are all decided on the broad ground that the question is a purely political one, over which the court has no jurisdic-

tion if it is not specially given by the law making power. Cases supporting this doctrine might be cited at great length. In fact, there are but three states that have held the opposite doctrine.

In *Boren v. Smith*, 47 Ill. 482, it was held that in a county seat case where fraud was alleged a court of chancery would take jurisdiction. The court in that case admitted the general doctrine, but made an exception as to a county seat case, for which we see no reason whatever. They further based their decision on the fact that the constitution has declared that such a vote should be taken before a county seat can be removed, and the court says:

"And in making that provision, it is manifest that it was designed that the will of the majority of the legal voters of the county should control. It would defeat that object, and render this fundamental provision inoperative, if the sense of the majority of the legal voters. constitutionally expressed, might be overcome by illegal voters, or other fraudulent means. . . . As there is no law in England similar to this provision of our constitution, and the organic laws of other states are believed to have no such provision, it is not to be expected that precedents may be found upon which to base the jurisdiction of a court of equity. But if our courts of equity were, in the absence of legislative action, to refuse relief, this constitutional provision could, by fraud, be rendered inoperative and wholly defeated."

This argument is squarely against the decision in *State, ex rel. Reed, v. Jones*, 6 Wash. 452 (34 Pac. 201), where this court held that, where an act of the legislature had been properly certified, courts had no authority to inquire into any prior proceedings on the part of the legislature to ascertain whether the mandatory provisions of the constitution had been complied with, but that the enrolled bill properly certified to was conclusive evidence of that question. This decision was based upon the theory that the legislature was one of the coördinate departments of the

government, with equal authority with the others, and that the assumption is a false one, that the "mandatory provisions of the constitution are safer if the enforcement thereof is entrusted to the judicial department than if so entrusted to the legislature." Or, "in other words," said this court, "courts holding the other view have acted upon the presumption that their department is the only one in which sufficient integrity exists to insure the preservation of the constitution."

If, then, the removal of the county seat is a political question (a proposition which cannot be seriously denied), the regulation and control of which under our form of government are within the exclusive jurisdiction of the legislative department, it follows from the logic of *State v. Jones*, *supra*, that the state of facts, properly certified to by the tribunal, solely empowered by the legislature to pass upon the questions involved, must be taken as conclusive. The legislature has made provisions for the determination of these facts. In these provisions it did not see fit to provide for any review or investigation by the courts, and the courts, therefore, are without authority to act in the premises.

*People v. Wiant*, 48 Ill. 263, is decided on the same grounds. But in neither case is it assumed or intimated that they are following the weight of authority, or any authority at all. As, however, the authorities opposed to the jurisdiction in cases of this kind are so overwhelming, we feel bound to follow them, and it will not be necessary to examine the other questions raised by the demurrer.

The judgment of the lower court is, therefore, affirmed.

ANDERS and SCOTT, JJ., concur.


STILES, J. (*dissenting*):

"An adequate remedy will always be found, either at law or in equity, for frauds perpetrated against the purity

of elections. If a result has been secured by fraud, and
the statute has provided no mode of redress, it by no
means follows that no redress can be had. The right of
any person claiming to exercise any public function or
authority under a fraudulent election, may be tested by
proceedings in quo warranto, under the principles of com-
mon law." McCrary on Elections, § 354.

The context of the foregoing quotation concerns the re-
moval of county seats.

"Where a statute requires a county office to be located
at the county seat, mandamus will lie to compel the officer
to open and hold his office there. And it is no answer to
such a proceeding to show that there is a dispute as to
which of two or more places is the county seat. The court
is bound to inquire and determine where the county seat
is, even if in order to do this it may be necessary to deter-
mine as to the legality or result of an election held to settle
the question of the location or removal of the same."
McCrary, § 366; *State v. Commissioners*, 35 Kan. 640 (11
Pac. 902).

The term "political question" has been made, in the
opinion of the court deciding this case, to perform a very
large and imposing, but, it seems to me, at the same time,
misleading part. I think it is shadow without substance.
Titles to office have been from the earliest times proper
matters for judicial inquiry, and the writ or information of
quo warranto was invented for that purpose. High, Extr.
Leg. Rem., chap. 14. From the use of this writ the
power to inquire into every step of an election has been
but a necessary corollary. Statutes providing for con-
tests, unless they are clearly made exclusive, are only cumu-
lative remedies. High, Extr. Leg. Rem., § 624; McCrary
on Elections, § 334. And the returns of canvassing officers
are merely *prima facie* evidence of the facts they certify.
High, Extr. Leg. Rem., § 638; *Reynolds v. State*, 61 Ind.
392; *State v. Shay*, 101 Ind. 36; *Kane v. People*, 4 Neb.
509.

But I fail to comprehend wherein an election to determine the location of a county seat differs in its "political" character from that of any other election; and as the founders of the common law found a way over the technical objection that there was no jurisdiction to inquire by what right a usurper occupied an office, and extended their investigations when elections came to be the method of selecting officers, so I deem it not only the right but the duty of modern courts of general jurisdiction to further extend these well established powers to other cases where public and private rights are affected by elections.

My associates have cited the cases which oppose this doctrine, from courts which have declared themselves to be unable to find any remedy for frauds on the ballot, unless there is an office at stake or the statute makes some express provision, and these few cases are credited with overwhelming authority; but to me they are far from satisfactory. To begin with, all but two of them come from southern states, where the tendency has been to sustain election officers and returning boards at all hazards. The principal case cited from Louisiana is *State v. Police Jury*, 41 La. An. 846 (6 South. 777), and the language quoted is very strong; but at page 850 some light is thrown upon the matter, for it is there said:

"Courts of common law undoubtedly claim an inherent right to entertain jurisdiction over contested elections under proceedings in the nature of quo warranto; but referring to the provisions of our code of practice on that writ, it will be seen that they confine that remedy to 'disputes between parties in relation to offices in corporations,' and *expressly declare* that 'with regard to offices of a public nature, that is, which are conferred in the name of the state by the governor, or by election, the usurpations of them are prevented and punished by special laws.' This common law jurisdiction is, therefore, *expressly excluded by our statute.*"

In fact, the cases cited from Michigan, Georgia, Texas and Tennessee are the only ones which hold squarely that there is no remedy at all. In *McWhirter v. Brainard*, 5 Or. 426, the point here in issue was disposed of in these words:

"There is no special statutory provision for contesting an election for location of county seat; but we think that when the question, in such a case, is the qualification of the voter, the conduct of the judges or the legality of the canvass, the *proper remedy is by mandamus*, and not by injunction in equity;"

showing no disposition on the part of that court to cut off absolutely all inquiry into the merits of the election.

Mr. High yields approval to the remedy by mandamus, where the retention of offices at county seats, or the removal of them to a new location, is in issue. Extr. Leg. Rem., § 79.

As opposed to the cases cited by the majority, two Illinois cases alone are referred to, and of these it is said that they neither assume nor intimate that they followed the weight of authority or any authority at all. Now, these Illinois cases occur in 1868, when there was no constitutional provision concerning the relocation of county seats anywhere but in that state; and it is worthy of remark that both of these cases antedate in time all of the cases holding that there is no remedy without a statute which are now produced in support of that rule. We have precisely the same constitutional prohibition as that construed by the supreme court of Illinois, reading:

"No county seat shall be removed unless three-fifths of the qualified electors of the county voting on the proposition at a general election shall vote in favor of such removal, and three-fifths of all votes cast on the proposition shall be required to relocate a county seat." Art. 11, § 2.

The supreme court of Idaho recently sustained an in-

junction against the removal of a county seat as the result of an illegal election. *Doan v. Commissioners*, 2 Idaho, 781 (26 Pac. 167).

In *Sweatt v. Faville*, 23 Iowa, 321, an injunction case, it was said:

"Our law does not provide any method for contest in these cases. . . . That the legislature should make some provision on this subject, and give a speedy, plain and summary method for settling these most warmly contested and, to the public, important controversies, each day renders more and more manifest. Our courts should not be required to pass upon them in the first instance, but a tribunal should be provided where the whole matter could be speedily tried and determined. In the absence of such legislation, can equity grant the relief asked? The case of *Rice v. Smith*, 9 Iowa, 570, is an authority for the exercise of the power, as prayed for in this petition, and we are content to there leave it. In view of all the decisions, and especially the limited duties and powers of the board of canvassers under the writ of mandamus, we know of no other adequate remedy in these cases."

This decision was rendered in 1867, and the remarks there made concerning the limited powers of the board of canvassers are extremely pertinent here, since under our statutes no grade of election officers has the power to investigate or pass upon anything but the returns which are made by the precinct officers.

In Kansas, in 1870, in the case of *State v. Marston*, 6 Kan. 524, the supreme court held that mandamus would lie to investigate frauds in a county seat election, notwithstanding the statute which allowed twenty days after the date of the election to contest the result; and the opinion, which is a strong one, especially upholds the right of any person who is beneficially interested in a particular place for the county seat, to maintain the suit. The same doctrine was upheld in *State v. Stevens*, 23 Kan. 456; *State v. Commissioners*, 35 Kan. 640 (11 Pac. 902).

In *Calaveras County v. Brockway*, 30 Cal. 326, decided in 1866, although the boards of supervisors in California constituted the canvassing boards of the counties, it was held that the determination of the board of supervisors that a certain town had received a majority of all the votes cast in favor of its location as the county seat, was *prima facie* evidence only of the fact so determined; and that if the fact were otherwise than as determined by the board it would be an unjust denial of the right of the electors of the county to shut the door against all remedy for the redress of the wrong. Mandamus was awarded to contest the result.

In 6 Am. & Eng. Ency. of Law, p. 392, is this statement:

"While the court will not enjoin the holding of an election, or the canvass of the vote, yet when the election is held to determine questions such as the removal of the county seats, or subscribing to capital stock of corporations, and there is no provision for contesting the election, it has been held that an injunction may be granted to prevent the officer from doing the act authorized by the election, where it is alleged that the majority was caused by fraudulent or illegal voting."

And it is evident that, although the cases *contra* are cited in the notes, the text, in the judgment of the compiler, states the *correct* law of the case.

Michigan has been mentioned as one of the states which upheld the doctrine of non-intervention by the courts in the matter of the removal of county seats, on the ground that such removals were purely political questions over which the courts had no jurisdiction. Yet that court has recently gone so far as to interfere by injunction with the secretary of state in the matter of calling an election for state senators and representatives, one of the grounds for its action being that the act of the legislature making the apportionment violated the portion of the constitution which required each

senatorial and representative district to contain as nearly as might be the same number of inhabitants as the others.

Now the constitution of that state provided for a census, and it might be supposed that the legislature would have equal means with the supreme court for ascertaining the population of the state and its location in the various counties and cities; and the apportionment of senators and representatives is certainly the very highest exercise of political power of which a legislature is capable; yet in this case the court went behind the face of the law which contained the finding of the legislature as to what the census showed to be the population and where it was located, and inquired into the facts, and finding that gross errors had been committed in the matter of putting an immense population in one district and a meagre population in another, held the law, by reason of the facts, to be unconstitutional, and compelled the secretary not only to refrain from issuing his notice of election under the unconstitutional law, but also directed him to issue the call under a previous statute which had been expressly repealed; and this was done in one case, at least, at the instance of a private citizen who merely alleged that he was an elector of the seventh district. The court said, in *Giddings v. Blacker*, 93 Mich. 1 (52 N. W. 944):

"The basis upon which relief is sought is that the power delegated by the above provisions of the constitution to rearrange the senatorial districts is limited; that this limitation was wholly disregarded by the act in question, and the act is therefore unconstitutional and void. It appears conceded by the learned attorney general that the legislature is not in the exercise of a political and discretionary power when acting under these constitutional provisions, for which it is only amenable to the people, and that this court has jurisdiction, in a case properly before it, to determine the constitutionality of the act in question."

See also *Board of Supervisors v. Blacker*, 92 Mich. 638 (52 N. W. 951).

Now, if the legislature, in the matter of an apportionment, was not acting under political and discretionary power by reason of the constitutional mandate, so in the matter of re-location of county seats, where the prohibition is, as in this state, absolute and unqualified, the power must be also taken to be limited; and the conclusion would be forced upon us by this argument that if it be a fact that the legislature has passed an act for the re-location of a county seat which provides for no means by which frauds can be detected and the actual validity of the election determined, then the law must be an unconstitutional law in itself. The proposition is reduced to this, under the decision of the court, that the bare dictum of the county commissioners asserting that a vote upon the removal of a county seat has resulted in a certain way is incontestable by any power on earth. This court says that the courts cannot look into it, and the constitution prohibits the legislature from doing so because it can pass no special act on the subject, and no re-submission of the question can be made at an earlier period than four years. Such a delegation of power to a purely ministerial body is otherwise unheard of under the system of state governments prevailing in this country, and the plain spirit of the constitution is clearly against it.

The case of *State v. Jones*, 6 Wash. 452 (34 Pac. 201), has no bearing upon or relation to this subject. The legislature is a coördinate, independent, legislative branch of the state government, set up by the constitution for the purpose of passing laws. Certain restrictions are by the constitution laid upon it as to the method in which it shall operate, and the case above cited merely holds that when it has, by its constituted officers, certified that it has passed a certain law, the courts, recognizing its equal supremacy with themselves in its own department, will not go back of the certificate and enter upon a practically impossible in-

quiry as to whether or not the forms prescribed by the constitution were followed in procuring the enactment.

But the board of county commissioners is nothing but the ministerial hand of the legislature, provided for the convenient execution of the law which has been passed. It has no sanctity attached to its action, and its proceedings have no more finality than those of any other municipal or executive officer upon whom the duty is cast of executing the laws of the state.

In my judgment, the only question which a court, with the allegations of this complaint before it, should consider, is, what is the proper remedy? To refuse any relief because the legislature has failed to make a complete election law, is to nullify the constitutional right of each elector to vote and have his ballot counted; for it is error to declare, as does the decision, that the right of the plaintiff to vote upon this proposition depended to any extent upon the act of the legislature. Const., art. 6, § 1; art. 11, § 2.

At the time this action was brought the county seat had not been removed from Oysterville, but the removal was imminently threatened. Mandamus, under the highest authority, would have lain to compel the retention of the offices at that place, and the alleged frauds could have been inquired into in that proceeding. Why not by injunction, as well? The sole difference between the pleadings under the two remedies would have been the prayer of the complaint. As filed, the prayer is that the defendants be restrained from moving their offices *from* Oysterville; in mandamus it would have been that they keep them *at* Oysterville. The difference between the remedy by mandamus and the remedy by injunction would be so infinitesimal in such a case as this, that I hold that all regard for the old formal technicalities should have been brushed aside, and the relief demanded by the facts alleged promptly applied.

The briefs of counsel state that the motion to dismiss

was granted by the court below, upon the ground that the plaintiff had· a complete remedy by a direct appeal from the order declaring the county seat removed; wherefore the action would not lie. In treating of that disposition of the case it would be necessary to consider the law under which the order removing the county seat is made.

By the general law governing elections in this state (Gen. Stat., title 8, Of Elections), boards of county commissioners have nothing to do with general elections except that they appoint the local election officers. Elections are called by the auditor, and the returns are made to him. The canvass is made by the auditor, the judge of probate of the county and one other county officer who is summoned to that duty by the auditor; and when the canvass has been made and the canvassing officers have certified the result, it is· the duty of the auditor to issue certificates of election to the candidates having the highest number of votes. The election returns remain in the custody of the auditor and at no time reach that of the commissioners.

The statute governing the removal of county seats (Gen. Stat., title 38, ch. 3), provides that the board of county commissioners, upon the receipt of the proper petition, must, at the next general election of county officers, submit the question of removal to the electors of the county. Sec. 2459. No method is provided by the statute by which the order of the board submitting the question of removal is to be officially transmitted to the auditor who calls the election. But supposing that *hiatus* to be bridged over and the election to be called, § 2462 reads as follows:

"When the returns have been received and compared, and the results ascertained *by the board*, if three-fifths of the legal votes cast by those voting on the proposition are in favor of any particular place, the board must give notice of the result by posting notices thereof in all the election precincts in the county."

Now the language quoted above implies as plainly as language can that the board itself shall in some way pass upon the sufficiency of the vote, and here occurs the most serious difficulty in the matter; for we have seen that the election returns, including the poll books and the ballots, all rest finally with the county auditor, and no means is furnished by which the commissioners can acquire legal or official possession of them for any purpose. Therefore, it is impossible to see how the board can, as required, either receive or compare the returns or ascertain the result.

This matter seems to have been entirely overlooked by the legislature in passing the act in question, and the law is therefore radically deficient. The act of February 2, 1888, providing for the permanent location of county seats in new counties, avoided this difficulty by providing that the vote cast at the election for the location of the county seat should be "canvassed, certified and returned in the same manner as at general elections: *Provided*, That the county auditor shall return the result of such election to the county commissioners, who shall meet and declare and enter the result upon their records." Gen. Stat., § 2454. This law furnishes the commissioners with an official basis for their proceeding, viz., the return of the result made by the auditor; but the statute relating to the re-location of county seats furnishes no such means of ascertaining the result.

In the case at bar it appears from the statements in the pleadings that the county commissioners, by some means or other, obtained possession of the poll books and pretended to make a canvass themselves, a thing which the law of elections in no way authorizes or countenances. Probably this course was taken because the officers found nothing in the law directing them how to proceed, and considered the method under which they did proceed as a reasonable method. But the laws governing elections do

not depend upon reasonable methods, but upon express statutory direction.    That the method chosen by this particular board is not necessarily the only method, is shown by the fact that in another case now pending before this court, another board pursued the method of calling upon the county auditor to certify to it the return made on the question of re-locating the county seat, by the official canvassers, as though the vote had been taken under the act of 1888.    It is needless to say that one or the other of these methods was wrong.

Thus much has been said with a view of showing that while an appeal from the order of the board might bring before the court the sufficiency of the proceedings taken by the board, it would not by any means serve the purpose sought to be arrived at in this case; for the board is not authorized by the statute to enter into any election contest, nor has it any authority whatever to examine ballots or poll books or certified returns.

For these reasons the appeal would have been an entirely inadequate and useless remedy.    Possibly the court, upon such an appeal, might have come to the conclusion that, for the reason that the board of commissioners is charged with the duty of canvassing election returns, and at the same time is furnished no means whatever by which it can acquire the possession or right to investigate or consider the returns, the whole statute is rendered nugatory and all proceedings under it void.    In that case the remedy by appeal would have been sufficient, since the injunction would have properly followed such a finding; but the point does not seem to have been raised or suggested.

There only remains to consider the question whether a private citizen can interfere.    The court says that he cannot because he shows no interest in the subject matter. Every case that I have cited holds to the contrary, and the reason of the thing is to the contrary.    In this case it is

shown by the complaint that the plaintiff has a large property interest in the former county seat. Moreover, the county is there possessed of property in the shape of county buildings which are practically useless for any other purpose and will have to be abandoned by the county. At the new county seat new buildings must be provided. All this must be at public expense, and plaintiff, as one of the tax payers of the county, must help to pay the cost. Moreover, every citizen of a county has a personal interest in the location and place of business for the county officials with whom he has to deal. The courts do not hesitate when a board of county commissioners, under the law, authorize the issuance of bonds whether for the incurring of new indebtedness or for the funding of old, to inquire, at the petition of any citizen, into the legality of the election held for the authorization of bonds. This court has passed upon many such cases, and not a term passes that one or more of them is not before us covering either county or municipal bonds. The logic of this decision would be to deny the jurisdiction of this court in all such cases and leave it wholly to the unbridled determination of purely ministerial officials to determine whether or not the law has been complied with. I cannot subscribe to any such doctrine, and believe that the adoption of it would be wholly mischievous and confusing.

In *Todd v. Rustad*, 43 Minn. 500 (46 N. W. 73), the court said:

"An action for a permanent injunction restraining the removal of a county seat, or the expenditure of public funds, or the creation, unlawfully, of public indebtedness for the erection of county buildings, may, however, be maintained on the ground of an entire absence of legal authority to do the acts complained of, as where the proceedings threatened are under a statute which is unconstitutional, and are wholly unauthorized and void. We see no reason why a citizen and taxpayer should not in such case have the same right to his remedy by injunction,

in a proper case, to restrain the unlawful removal of the county offices as to his remedy by mandamus to compel their restoration to the county seat.''

The injunction was refused in that case only because the statute had provided a summary, adequate mode of procedure for contesting the regularity and validity of the election. To the same effect was *State v. Weld*, 39 Minn. 426 (40 N. W. 561).

In the celebrated Wisconsin apportionment case, *State v. Cunningham*, 81 Wis. 440, 506 (51 N. W. 724), cited and relied upon in the Michigan cases, Pinney, J., after arguing that the apportionment by the legislature, under the direction of the constitution, was the exercise of legislative rather than political power, closed the question of the court's power to interfere in this language:

''But if it is not strictly a legislative power, if, as counsel contends, it is a mere act of *political power*, upon what possible ground can it be maintained, in the face of the plain provisions of the constitution by which it is limited and restrained, that the delegate in the performance of his trust becomes superior to his creator and may transcend the terms of his commission, and disregard its conditions and limitations, and still his act be deemed valid and conclusive? To so hold would be to declare that the conditions and restraints placed by the constitution upon the exercise of its power, vital to the maintenance and preservation of a popular representative form of government, are only of optional obligation, and that the very guaranties of its perpetuity may be so wrested from their purpose and perverted as to become the speedy and certain instruments to subvert and destroy it. It is clear to my mind that the restraints and conditions annexed to the power abide with it, and when disregarded it is the right and duty of the court to declare the act void.''

Applying this principle to the case before us, I must dissent from the conclusion that the courts can apply no remedy to this confessed wrong.

Hoyt, J., concurs.