[No. 32519. *En Banc.* September 10, 1953.]

ED. ROEHL, *Appellant*, v. PUBLIC UTILITY DISTRICT NO. 1 OF CHELAN COUNTY *et al., Respondents.*[1]

[1]Reported in 261 P. (2d) 92.

*Shiner & Arneil,* for appellant.

*Harvey F. Davis, Weter, Roberts & Shefelman, W. J. Daly, Warren J. Gilbert, Parker Williams,* and *John S. Lynch,* for respondents.

*J. W. Bryan, Greenwood & Shiers,* and *Metzger, Blair, Gardner & Boldt, amici curiae.*

HAMLEY, J.—This litigation involves the proposed joint acquisition, by five public utility districts, of substantially all of the electric utility properties of Puget Sound Power & Light Company.

The action was brought by Ed Roehl, a resident and taxpayer of Wenatchee, Chelan county, Washington, and a customer receiving electric utility service from public utility district No. 1 of Chelan county. The latter agency, hereinafter referred to as Chelan district, and the three commissioners of that district were named defendants.

The threefold purpose of the action is to (1) obtain a declaration that chapter 227, Laws of 1949, p. 799, under the authority of which the five districts purported to act, is unconstitutional; (2) restrain Chelan district from acquiring electric facilities and issuing its bonds pursuant to the joint purchase plan; and (3) obtain a declaration that the purported consent of public utility district No. 1 of Kitsap county, Washington (Kitsap district), to the acquisition of Puget Sound Power & Light Company (Puget) electric utility facilities by the five public utility districts is void and of no force and effect.

In its answer to the complaint, Chelan district asks that a decree be entered declaring that chapter 227, Laws of 1949, is valid and constitutional; and that an order be entered denying the relief sought by plaintiff and dismissing the complaint.

The four other public utility districts involved in the joint acquisition plan are public utility districts No. 1 of Jefferson, Skagit, Snohomish, and Thurston counties, respectively. Each of those four districts filed a complaint in intervention, asking for relief similar to that for which Chelan district prayed.

Following a nonjury trial, the court entered a judgment declaring chapter 227, Laws of 1949, valid and constitutional, and dismissing the complaint. Plaintiff appeals.

Appellant's twenty-five assignments of error present eight separate questions. These questions will be considered seriatim.

The first question is whether the trial court should have declared chapter 227, Laws of 1949, unconstitutional, on the ground that it was enacted in violation of Art. II, § 38, of the state constitution. The joint purchase plan in question is dependent upon the validity of that chapter. Section 2 thereof (RCW 54.16.200 [*cf.* Rem. Supp. 1949, § 10459-15]) provides the only statutory authority under which public utility districts may enter into joint arrangements of this general character.

Art. II, § 38, of the state constitution, reads as follows:

"LIMITATION ON AMENDMENTS.—No amendment to any bill shall be allowed which shall change the scope and object of the bill."

Chapter 227, Laws of 1949, is the present identification of enrolled House bill No. 561, as passed by the 1949 session of the state legislature. There is nothing on the face of this enrolled bill to indicate a violation of Art. II, § 38.

Appellant, however, asked the trial court, and now asks us, to go behind the enrolled bill and examine the legislative history of H. B. 561. In this connection, he introduced into evidence a certified copy of H. B. 561 in its original form; certified copies of H. B. 322 and S. B. 301, as introduced and considered by the 1949 legislature; and bound copies of the House and Senate journals of that legislature.

Appellant states that an examination of these documents will disclose that H. B. 561 originally consisted of two sections; that it was amended to include the single section of H. B. 322 and fourteen of the fifteen sections of S. B. 301; that the title of H. B. 561 was enlarged to include, almost verbatim, the titles of these two other bills; and that the subject matter of the new sections thus added to H. B. 561 served to change the scope and object of that bill.

Respondents do not agree with this contention. They also raise the preliminary question of whether it is proper for the courts to go behind the enrolled bill and examine the legislative history for the purpose of determining whether H. B. 561 was validly enacted.

■ In raising this preliminary question, respondents invoke the so-called "enrolled bill rule." Using the picturesque words which Judge Mackintosh employed in *State ex rel. Dunbar v. State Board of Equalization,* 140 Wash. 433, 249 Pac. 996, this rule may be stated as follows:

"Finding an enrolled bill in the office of the secretary of state, unless that bill carries its death warrant in its hand, the courts will make no investigation of the antecedent history connected with its passage, except as such an investigation may be necessary in case of ambiguity in the bill for the purpose of determining the legislative intent." (p. 443)

The enrolled bill rule was adopted early in the history of this state, and has been followed repeatedly and without deviation. In the following cases, the rule was applied so as to foreclose inquiry as to the validity of the enactment of the statutes there in question: *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac. 201; *State ex rel. Dunbar v. State Board of Equalization, supra; Morrow v. Henneford,* 182 Wash. 625, 47 P. (2d) 1016; and *State ex rel. Bugge v. Martin,* 38 Wn. (2d) 834, 232 P. (2d) 833.

In the following additional cases, the rule was appropriately discussed and adhered to, in connection with the consideration of other questions which were before the court: *Parmeter v. Bourne,* 8 Wash. 45, 35 Pac. 586, 757; *Scouten v. Whatcom,* 33 Wash. 273, 74 Pac. 389; *Gottstein v. Lister,* 88 Wash. 462, 153 Pac. 595; and *Shelton Hotel Co. v. Bates,* 4 Wn. (2d) 498, 104 P. (2d) 478. In the *Gottstein* case, the court, after approving the enrolled bill rule, said that an examination of the legislative history would have required the court to reach the same result.

The approval of the enrolled bill rule, as expressed in *Casco Co. v. P. U. D. No. 1 of Thurston County,* 37 Wn. (2d) 777, 226 P. (2d) 235, must be regarded as *dictum.*

In *Power, Inc. v. Huntley,* 39 Wn. (2d) 191, 235 P. (2d) 173, the merits of the enrolled bill rule were argued, but we found it unnecessary to decide the question, as the act was found to be unconstitutional on other grounds. In *Derby Club v. Becket,* 41 Wn. (2d) 869, 252 P. (2d) 259, where a statute was held unconstitutional on various grounds, two

concurring opinions were filed, representing the views of four judges, in which the position was taken that the court should abandon the enrolled bill rule.

Following this cue, appellant in the instant case asks us to abandon that rule and, in the process, overrule the long line of decisions to which reference has been made. He urges us to adopt what is known as the "journal entry rule." There are several variations of the latter rule, the most commonly expressed form of which may be stated as follows: It will be presumed that the legislature has met all constitutional requirements in enacting legislation evidenced by an enrolled bill, but this presumption may be rebutted by the legislative history of the bill as recorded in the official legislative journals.

It may be noted at this point that appellant did not confine himself to the legislative journals in his effort to prove a violation of Art. II, § 38. He also introduced certified copies of several bills, the contents of which, save for their titles, do not appear in the journals. Considering only the legislative journals, however, it is possible to determine the extent to which H. B. 561 was amended.

In 1 Sutherland, Statutory Construction (3d ed. 1943) 224, 230, §§ 1402, 1405, the statement is made that the present tendency seems to be toward according the enrolled bill only a *prima facie* presumption of validity and permitting attack by any clear, satisfactory, and convincing evidence establishing that the constitutional requirements have not been met. It will be observed that, under such a rule, the impeachment of an enrolled bill would not be limited to facts established by the legislative journals.

In considering the respective merits of the enrolled bill rule and the journal entry rule, it should be borne in mind that enrolled bills and legislative journals are both official records of legislative action. The authentication of bills and their enrollment with the secretary of state is required by Art. II, § 32, and Art. III, § 17. The recording of legislative action in journals maintained by the two houses of the legislature is required by Art. II, §§ 11, 21, 22 and 36, and Art.

III, § 12. In order of sequence, the enrolled bill is the final record.

The legal theory upon which the enrolled bill rule is grounded is that the legislature is a co-ordinate branch of the government, in no sense inferior to the judicial branch, and consequently its final record, when certified and recorded as required by the constitution, imports absolute verity. *State ex rel. Reed v. Jones, supra,* p. 460.

Judge Hoyt, who spoke for the court in the *Reed,* case, had been president of the convention which drafted our state constitution. He had a deep understanding of the proper relationship between the three co-ordinate branches of government. Professor Wigmore states that Judge Hoyt's opinion in that case is "perhaps the best on the subject," and that it "would alone render superfluous all other deliverances on the subject." 4 Wigmore on Evidence (3d ed.) 699, § 1350.

Dealing with the legal theory upon which the enrolled bill rule is based, Judge Hoyt said:

"Each of the three departments into which the government is divided are equal, and each department should be held responsible to the people that it represents, and not to the other departments of the government, or either of them. What are the respective duties of these departments? They may be briefly stated thus: The legislature enacts laws, and is commanded by the constitution to enact them in a certain way; the executive enforces the laws, and by the constitution it is made his duty to take certain steps looking towards such enforcement in the manner prescribed therein upon the happening of certain contingencies; the judicial department is charged with the duty of interpreting the laws, and adjudging rights and obligations thereunder. What is the law upon which the judicial department must thus determine rights and obligations? It is—*First,* The constitution of the state; *second,* so much of the common law as is in force here, and the laws of the legislature; and, *third,* the acts of the executive department in those matters in which, under the constitution, it is given the power to exercise discretion under certain contingencies. Such being the respective duties of the several departments, it seems to us that the acts of each of them when certified as required by the constitution, or by such a universal course

of practice as to have the force of a constitutional provision, should be conclusive upon each of the other departments, and there would seem to be no more impropriety in the legislature seeking to go behind the final record of a court, for the purpose of determining whether or not it had obeyed the constitutional directions in making such a record, than there would be in the courts seeking to go behind the final record made by the legislative department." (p. 461-2)

Those courts which follow the journal entry rule rely chiefly upon the argument of constitutional necessity. Stated briefly, this argument is predicated upon the idea that, except by adopting the journal entry rule, there is no way to obtain enforcement of constitutional restrictions upon legislative action. We have found no more forceful presentation of this viewpoint than that advanced by Chief Justice Murray in *Fowler v. Peirce*, 2 Cal. 165:

"I am of opinion that there is no difference between declaring a law unconstitutional for matters patent upon its face, though passed regularly, and a law apparently good, yet passed in violation of those rules which the Constitution has imposed for the protection of the rights and liberties of the citizen. If such matters cannot be inquired into, the wholesome restrictions which the Constitution imposes on legislative and executive action become a dead letter, and Courts would be compelled to administer laws made in violation of private and public rights without power to interpose. The fact that the law-making power is limited by rules of government, and its acts receive judicial exposition from the courts, carries with it, by implication, the power of inquiring how far those exercising the law-making power have proceeded constitutionally. . . . It is no sufficient answer that we must rely on the integrity of the executive, or other officers, and that the record of acts is conclusive evidence of the truth of such acts. Our notions of free institutions, revolt at the idea of placing so much power in the hands of one man, with no guard upon it but his integrity; and our constitution has wisely so distributed the powers of government, as to make one a check upon the other, thereby preventing one branch from strengthening itself both at the expense of the co-ordinate branches, and of the public." (pp. 168, 171)

Professor Wigmore, after quoting this and other language from the opinion in *Fowler v. Peirce*, terms the argument of constitutional necessity there advanced a "spectral scruple, created by false logic." 4 Wigmore on Evidence (3d ed.) 699, § 1350. He proceeds then to analyze the argument in detail, pointing out first that it is impossible of consistent application. If there is a duty, as this argument presupposes, to see that the constitutional facts did exist, then the examination cannot stop short with the journals. It is just as likely that a proper vote was falsified in the journal as that an improper vote was falsified in the enrollment. Yet few courts suggest going behind the journals, thus conceding, as Professor Wigmore says,

". . . the supposed constitutional duty not to be inexorable, after all; for if the duty to get at the facts is a real and inevitable one, it must be a duty to get at them at any cost; and if it is merely a duty that is limited by policy and practical convenience, then the argument changes into the second one above, namely, how far it is feasible to push the inquiry with regard to policy and practical convenience; and from this point of view there can be but one answer." (p. 700)

Professor Wigmore then points out that the fact that the scruple of constitutional duty is treated thus inconsistently and pushed only up to a certain point suggests that it is based on some fallacious assumption. He believes this to be the case, the fallacious assumption being the notion that every constitutional provision is *"per se"* capable of being enforced through the judiciary, and must be safeguarded by the judiciary because it can be in no other way. Attention is then called to numerous constitutional provisions placing duties upon the executive and legislative branches and concerning which there never is any assertion of, or attempt to secure, a judicial remedy. Wigmore classifies the constitutional mandates here in question in this category, and declares that it is for the legislature alone to take notice of such requirements, and that it is not the function of the judiciary to keep the legislature to its duty.

We believe, with Professor Wigmore, that the argument of constitutional necessity is unsoundly premised and in-

ternally inconsistent. And we share Judge Hoyt's view that

" . . . to preserve the harmony of our form of government it must be held that these several mandatory provisions are addressed to the department which is called upon to perform them, and that neither of the other departments can in any manner coerce that department into obedience thereto." *State ex rel. Reed v. Jones, supra,* p. 462.

Accordingly, we decline to enter into an examination of the legislative history of chapter 227, Laws of 1949, for the purpose of determining whether that chapter was enacted in violation of Art. II, § 38.

The second question presented by appellant's assignments of error is whether § 2 of chapter 227 is unconstitutional because it violates Art. II, § 37, of the state constitution. That provision of the constitution reads as follows:

"REVISION OR AMENDMENT.—No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

Appellant contends that § 2 of chapter 227 amends § 6, chapter 1, Laws of 1931, p. 11, as amended (RCW 54.16-.010—54.16.190 [*cf.* Rem. Supp. 1945, § 11610]), and since the latter section is not set forth at full length in the later enactment, there has been a failure to comply with the above constitutional provision.

If appellant is correct in his interpretation of the object and purpose of § 2, chapter 227, then his conclusion that this chapter is unconstitutional is likewise correct. Where a later enactment is not complete in itself, but is clearly amendatory of a former statute, it falls within the constitutional prohibition. *Gruen v. State Tax Commission,* 35 Wn. (2d) 1, 211 P. (2d) 651; *Rourke v. Department of Labor & Industries,* 41 Wn. (2d) 310, 249 P. (2d) 236.

Respondents argue, however, that § 2 of chapter 227 is not amendatory of the 1931 act, as amended, but is what is known as a "reference" statute. Reference statutes are those which refer to, and by reference adopt wholly or par-

tially, pre-existing statutes, or which refer to other statutes and make them applicable to an existing subject of legislation. They are frequently used to avoid encumbering the statute books by unnecessary repetition, and they are recognized in this state and elsewhere as an approved method of legislation. *State ex rel. Washington Toll Bridge Authority v. Yelle*, 32 Wn. (2d) 13, 200 P. (2d) 467.

We turn to an examination of the two statutes here in question. Section 6, chapter 1, Laws of 1931, as amended, relates to the powers of public utility districts acting individually. Districts so acting may not acquire facilities outside the district except in the limited respects indicated in *State ex rel. P. U. D. of Skagit County v. Wylie*, 28 Wn. (2d) 113, 182 P. (2d) 706. The 1931 act provides no authority for mutual agreements between two or more districts, looking to the joint acquisition of integrated electric systems. Section 2 of chapter 227, on the other hand, relates exclusively to the matter of joint agreements and in no way expands, contracts, or affects the powers of such districts acting *individually*. In conferring such additional powers upon districts, the 1949 enactment does not spell out in detail the extent of and manner of exercising such powers. Instead, it provides simply that districts may "exercise jointly all powers granted to each individual district. . . ." While the powers theretofore granted to individual districts are specified in § 6, chapter 1, Laws of 1931, as amended, that statute is not expressly referred to in the 1949 act.

In our opinion, this latter enactment is not amendatory of the earlier statute, but is supplemental thereto. While the powers to act jointly, thereby conferred upon districts, are described by reference to the powers granted to individual districts, this does not operate to amend the earlier act.

It is indicated in *Rourke, supra,* that, in order for a later enactment to constitute a reference statute rather than an amendatory statute, it must be "complete in itself in every detail." This does not mean, however, that all powers granted must be set forth at length, rather than by referring

to earlier enactments. Were this true, the technique of legislation by reference would no longer be possible.

■ Nor does the quoted statement mean that the section and chapter of the enactment referred to must be expressly stated in the reference statute. The general method of reference here utilized was approved in *State ex rel. Hunt v. Tausick*, 64 Wash. 69, 116 Pac. 651. Numerous examples could be cited where the reference statute contains no specific designation of the earlier statute. This is particularly true respecting eminent domain statutes, it being the frequent practice to confer such powers upon a particular kind of agency by general reference to the similar powers exercised by another kind of agency. As a matter of fact, chapter 1, Laws of 1931, itself, in granting public utility districts the right of eminent domain, provides that such right shall be exercised "in the same manner and by the same procedure as is or may be provided by law for the exercise of the power of eminent domain by incorporated cities and towns. . . ."

■ It is our conclusion that chapter 227, Laws of 1949, is not in violation of Art. II, § 37, of the constitution.

The third question presented for determination is whether the proposed joint purchase can be validly consummated without obtaining an order of the public service commission authorizing such sale.

Section 2, chapter 159, Laws of 1941, as originally enacted, provided that no public service company shall sell the whole or any part of its properties or facilities without having secured from the department of public service (now the commission) an order authorizing it so to do. Section 3 of the same chapter provided that any such sale made without authority of the department shall be void. In 1945, section 2 was amended by the addition of the following proviso:

"*Provided,* That this section shall not apply to any sale, lease, assignment or other disposal of such franchises, properties or facilities to a public utility district." (Italics ours.) Laws of 1945, chapter 75, p. 220, Rem. Supp. 1945, § 10440-(b), RCW 80.12.020.

Appellant points out that in 1945, when this proviso was enacted, public utility districts did not have authority to enter into joint purchase arrangements of the kind here in question. Hence, it is argued, that proviso could not have been intended to relieve public service companies of the necessity of obtaining approval for joint purchases when authority to effectuate such purchases was conferred by chapter 227, Laws of 1949.

It may well be that the 1945 proviso must be construed as applying only to a sale to a single district, or at least as not applying to joint sales to several districts. But this does not necessarily conclude the inquiry, for it is also necessary to consider what was accomplished by the 1949 enactment.

Section 2, chapter 227, Laws of 1949, gave two or more districts power, by mutual agreement, to exercise jointly "all powers granted to each individual district. . . ." In our view, the term "powers" is here used in a broad sense. It evidences, we believe, the intention of the legislature to place several districts, when acting together ·to effectuate a joint purchase, in the same position in which an individual district would find itself in proceeding with the purchase of electric facilities within its boundaries.

An individual district would have been able to purchase such facilities without occasioning the delay and uncertainty attendant upon the obtaining of commission approval by the private utility company making the sale. Hence, under our interpretation of the quoted language of the 1949 act, the validity of the joint purchase here proposed is likewise not dependent upon the seller obtaining prior commission approval.

The fourth question presented is whether the five districts (Chelan, Jefferson, Skagit, Snohomish, and Thurston) have secured a valid assignment from Kitsap district of its rights under the purchase contract, and a valid consent from that district to acquire the electric utility distribution properties of Puget located in Kitsap county.

Originally, it was intended that the statewide electric utility properties of Puget, with certain exceptions, would be purchased by six districts, that is, Kitsap district and

the five districts involved in the joint acquisition plan now before us. On September 10, 1952, all six of these districts joined in a written offer to Puget to purchase such properties and facilities.

At that time, two of the three Kitsap district commissioners favored the joint acquisition plan, and one commissioner opposed it. The term of C. Jack Jones, one of the commissioners who supported the plan, was due to expire on November 30, 1952. At the election held on November 4, 1952, C. E. Ferguson, who opposed the purchase, defeated Jones. This assured that, on and after December 1, 1952, a majority of the Kitsap district commissioners would be in opposition to the proposed purchase.

On November 6, 1952, Puget accepted the offer. A contract of purchase was thereby effectuated. On the next day, November 7, 1952, Commissioner-elect Ferguson and others commenced an action in Kitsap county against Kitsap district and its three commissioners, and obtained a temporary restraining order and order to show cause. This order restrained Kitsap district and its commissioners, pending a hearing to be held on November 24, 1952, from joining with the five districts in such purchase, and from issuing its bonds.

Consummation of the original acquisition plan involving six districts as joint purchasers was thus prevented, at least temporarily. The remaining five districts, however, desired to go forward with the purchase, including the electric utility distribution properties located in Kitsap county. In order to do this, it was necessary to obtain from Kitsap district an assignment of its interests under the purchase contract which had been effectuated on November 6, 1952. It was also necessary to obtain the consent of Kitsap district to the acquisition by the remaining five districts of the electric utility distribution properties located in Kitsap county. See Laws of 1949, chapter 227, § 2.

The purchase agreement provided that the closing date would be the tenth day after execution of the agreement by Puget, or the next business day thereafter if the tenth day fell on Saturday, Sunday, or a holiday. The tenth day

fell on Sunday, November 16, 1952, thereby making November 17th the closing date. The agreement provided, however, that the closing date might be advanced or postponed by mutual agreement between Puget and the fiscal agent. On November 12, 1952, they mutually agreed to extend this date to November 28, 1952.

Several transactions occurred on November 19, 1952. The commissioners of Kitsap district, acting for the district, executed an assignment of its rights under the purchase contract to the five other districts. Under the terms of this instrument, the other districts were required to assume, jointly, all of the obligations of Kitsap district under the purchase agreement. The Kitsap district commissioners also adopted a resolution consenting to the acquisition of the utility properties located in Kitsap county by the five other districts.

On the same day that the assignment was executed, it was accepted by each of the five districts. Likewise on the same day, the five districts entered into a joint purchase agreement and a joint operating agreement relative to that portion of the purchased properties which would be jointly owned and operated by the five districts.

On November 20, 1952, in the Kitsap county court action previously referred to, the court entered an amended temporary restraining order, temporarily restraining Kitsap district and its commissioners from so consenting, and directing that such consent be withdrawn and revoked. The hearing on the show cause order was, in the same order, continued from November 24 to December 1, 1952.

On December 1, 1952, the new commissioner took office. A resolution was then adopted by majority vote of the Kitsap district commissioners, rescinding the consent previously given.

In the meantime, on November 26th, Puget and the fiscal agent, acting by mutual agreement, had postponed the closing date of the purchase agreement from November 28, 1952, to February 27, 1953. On February 19, 1953, they fur-

ther postponed the closing date from February 27 to July 31, 1953.

Several attorneys who represent Kitsap district were permitted to file a brief here as *amici curiae*. They argue that the validity of Kitsap district's consent cannot be adjudicated in this action because Kitsap is not a party hereto.

Appellant, who was plaintiff below, tendered the issue regarding the validity of the consent in his complaint. He could have joined Kitsap district as a party defendant, but chose not to do so. Neither he nor respondents raised the question in the trial court or on this appeal. Accordingly, we will not enter into a discussion of this point, which has been advanced only by *amici curiae*.

On the merits, appellant presents three reasons why, in his opinion, the assignment and consent to which reference has been made are not valid. The first of these is that they were given in violation of the intent and spirit of the temporary restraining order issued by the Kitsap county superior court on November 7, 1952.

In order properly to construe a restraining order, recognition must be given not only to the letter but also to the spirit of such order. The applicable rule is stated as follows in *Blakiston v. Osgood Panel & Veneer Co.,* 173 Wash. 435, 23 P. (2d) 397:

"A party enjoined must not do the prohibited thing nor permit it to be done by his connivance, nor effect it by trick or evasion. The order of the court must be obeyed implicitly, according to its spirit, and in good faith." (p. 438)

Bearing these principles in mind, we direct our attention to the restraining order here in question. It restrains Kitsap district and its commissioners, pending a hearing on the show cause order,

". . . from carrying out and executing, or from taking any further steps or actions to carry out and execute, your proposed plan for the acquisition, jointly with other Public Utility Districts of the State of Washington, of the electric utility properties of Puget Sound Power & Light Company, a corporation, or some substantial part thereof, and from executing or delivering bonds of the defendant, Public

Utility District No. 1 of Kitsap County for or in connection with the purposes aforesaid."

Appellant argues that, considering all the circumstances of the case, the above-quoted order evidences the intent of the Kitsap superior court to maintain the *status quo* as between Kitsap district and Puget, pending the hearing. Respondents, on the other hand, urge that this order only prohibited Kitsap district from joining with other districts in the joint acquisition of the Puget properties.

 We agree with the construction which respondents place upon this order. It restrains Kitsap district from carrying out and executing "your proposed plan for the acquisition, jointly" with the other districts of the Puget electric properties. It expressly restrains Kitsap district from executing or delivering its bonds "for or in connection with the purposes aforesaid." There is no reference, express or implied, to any other relationship between Kitsap district and Puget, or of a possible acquisition of Puget properties in Kitsap county by the five other districts.

It may very well be that, had plaintiffs in the Kitsap county action thought of it, they would also have applied for an order restraining that district from executing its assignment or consent. But they neither applied for nor received such relief.

Appellant's argument overlooks the essential difference between that which was prohibited and that which was done. To assign an option is not to buy the property which the option covers. Only the latter was enjoined. The consent stands on the same footing as the assignment. Both, in fact, served to carry out the spirit of the restraining order, for they operated to relieve Kitsap district from a contractual obligation to purchase which was already in existence, but which the court said should not be consummated.

Appellant contends that the amended temporary restraining order of November 20, 1952, is proof that the Kitsap superior court intended, by its original order, to maintain the *status quo*. In our view, however, it only evidences the recognition of the plaintiffs in that action that the original

relief which they obtained was not as broad as that which they later considered desirable.

Nor does the fact that Kitsap district proceeded to execute the consent and assignment prior to the return date (November 24, 1952) on the original show cause order evidence an attempt to evade the provisions of the original order. When the consent and assignment were executed on November 19, 1952, when the assignment was executed and contract was November 28, 1952. Kitsap district was contractually bound on that contract. Unless relieved therefrom, it ran the risk of being made defendant in a damage suit for breach of contract. There was imperative need for prompt action, or at least the then Kitsap commissioners had reasonable cause so to believe.

It is our conclusion that the consent and assignment in question were not given in violation of the intent and spirit of the restraining order of November 7, 1952.

The second reason advanced by appellant why, in his opinion, the assignment and consent are invalid, is that the "lame duck" board of commissioners, as constituted on November 19, 1952, when the assignment was executed and the resolution of consent adopted, did not have the power to bind the successor board in this manner.

Appellant calls attention to the fact that Puget and the fiscal agent, by successive agreements authorized by the purchase plan, extended the date of performance from November 17, 1952, to July 31, 1953. The board of commissioners was reconstituted on December 1, 1952, when the newly-elected commissioner took office, and was in control of Kitsap district affairs from that time forward. Hence, appellant argues, the action of the "lame duck" board was an attempt to tie the hands of the new board with respect to a contract which was not to be performed until the new board took over management of the district. *King County v. United States Merchants' & Shippers' Ins. Co.*, 150 Wash. 626, 274 Pac. 704, is cited as establishing the invalidity of such action.

In the *King County* case, a majority of the three-man board of county commissioners, acting for the board, entered into a contract with an insurance broker, whereby the latter was authorized to secure insurance upon the vessels owned by the county for the year 1927. This contract was entered into four or five days before the expiration of the term of one commissioner and the resultant reorganization of the board with its new member. On the day the contract was executed, or the next day, this insurance broker delivered to the board insurance policies covering all such vessels. Only one of these policies was to take effect prior to the reorganization of the board. The "lame duck" board accepted the policies, and the premiums were paid. As soon as the new board was organized, it rescinded the contract with the broker and returned all of the policies for cancellation. The insurance companies declined to cancel, and King county sued to recover the premiums.

The trial court rendered judgment for the plaintiff as to all policies. We affirmed as to the policies which were not to take effect until after the new board had been constituted, but denied recovery as to the policy which became effective prior thereto. In holding that the new board could cancel the policies which were not already in effect, we said:

"If the retiring board could make a contract for insurance, the policies of which did not take effect until after the reorganization of the new board, it would be possible for a retiring board, not only to tie the hands of the new board with reference to insurance upon county property, but in many other respects, and effectually hamper the new board in the care and management of property which the statute places in it." (p. 630)

While the principle announced in the *King County* case is a sound one, it has no application under the facts of the case before us. The purchase agreement was entered into on November 6, 1952, when Puget accepted the joint offer extended by Kitsap district and the other five districts on September 10, 1952. The closing date, as provided in that contract, was November 17, 1952, which was well within the period during which the old board had administrative

control of the district. Hence, the rule of the *King County* case in no sense affects the validity of the purchase agreement itself.

The assignment and consent were effected on November 19, 1952. Prior thereto, the closing date had been postponed to November 28, 1952. The new closing date then in effect, however, was still within the period of the old board's administrative control. That period did not expire until December 1, 1952. Hence, both the assignment and consent were effected with respect to a contract which was, as of November 19, 1952, to be performed during the old board's term of administration.

It is true that the purchase agreement contained a provision permitting postponement of the closing date. It is also true that, after delivery of the assignment and consent, the closing date was postponed to February 27, 1953, and then to July 31, 1953. Both of these latter dates fall within the period when the new board was in control.

The members of the old board, however, had no voice in the matter of postponing the closing date. Nor did they have any knowledge, on November 19, 1952, that the closing date would be extended beyond November 28, 1952. The validity of their action on November 19, 1952, must be judged with respect to the situation as it then existed. So judged, such action did not violate the principle laid down in *King County v. United States Merchants' & Shippers' Ins. Co., supra.*

In addition to what has just been said, it is clear that, in one important sense, the assignment and consent operated to "untie" the hands of the new commissioners, rather than to "tie" them. On November 19, 1952, Kitsap district was contractually bound on a purchase agreement scheduled for performance during the old board's period of control. Had the old board permitted that performance date to arrive without any effort to relieve Kitsap district of that contractual obligation, it is possible, as before indicated, that the district could have been compelled to perform, or respond in damages. Thus, the assignment, and the consent

which was part of the same transaction, operated to untie the hands of the new commissioners with respect to a purchase agreement which a majority of the new commissioners opposed.

■ The third reason advanced by appellant why, in his opinion, the assignment and consent are invalid, is that the successor board, on December 1, 1952, adopted a resolution revoking and rescinding the resolution of November 19, 1952, giving consent to the proposed acquisition by the five other districts.

We do not believe that a public utility district may, by unilateral action, withdraw its consent, once it has been validly given. Moreover, in this particular case, the consent was part of the consideration which the other five districts received for accepting Kitsap district's assignment of its rights under the purchase agreement. Acceptance of this assignment was valuable to Kitsap district, for the other districts thereby jointly assumed all of Kitsap district's obligations under the purchase agreement. Maintenance of the consent in full force and effect thus became a contractual obligation.

We conclude that this third reason advanced by appellant is without merit.

In our opinion, the five districts have secured a valid and binding assignment and consent from Kitsap district.

■ The fifth question raised by appellant's assignments of error is whether the proposed joint acquisition is unreasonably large.

More than fifty per cent of the distribution facilities to be acquired under the purchase agreement are located in King, Pierce, and Kitsap counties. Approximately one half of the customers served by the facilities being purchased are located in these three counties. None of these counties is represented by the five districts which propose to make the purchase.

These facts indicate, according to appellant, that the proposed acquisition is unreasonably large, and would result in the five purchasing districts becoming a "public power

czar" for the state of Washington. Appellant argues that the proposed purchase is therefore invalid. He urges us to apply to § 2, chapter 227, Laws of 1949, the following construction which was placed upon § 6, chapter 1, Laws of 1931, in *State ex rel. P. U. D. of Skagit County v. Wylie,* 28 Wn. (2d) 113, 182 P. (2d) 706:

"The right given, under subsection (d), to construct, condemn and purchase, purchase, and acquire plants, transmission and distribution lines, and facilities for generating electric current, is subject to the limitation that the facilities acquired must not be unreasonably large or entirely inappropriate for the accomplishment of that primary purpose." (p. 151)

The "primary purpose" referred to in the above-quoted language is the purpose of the power granted to a public utility district by subsection (d) of § 6, chapter 1, Laws of 1931 (Rem. Supp. 1945, § 11610(d) [*cf.* RCW 54.16.040]) to furnish a district and the inhabitants thereof with electric current for all uses, and, as an incident thereto, to furnish any other persons, including public and private corporations, within or without its limits, with such current for all uses. *Wylie, supra,* page 150.

This, however, is not the primary purpose of § 2, chapter 227, Laws of 1949, under which the five districts seek to acquire the electric properties here in question. The latter statute was enacted to authorize two or more districts, acting jointly, to do what, as we said in the *Wylie* case, one district could not do by itself. It provides that two or more districts may acquire jointly

". . . all or any part of any electric utility properties which, at the time of the passage of this act, constitutes an inter-connected and physically integrated electric utility system, whether entirely within or partly within and partly without such districts: . . ."

This broad language carries no implication, as did the 1931 act, that acquired facilities are to be limited, in general, to those located within or necessary to serve the customers of the purchasing districts. The implication is just the reverse—for the purpose of avoiding piecemeal destruction

of an integrated electric system, districts, acting jointly, are authorized to purchase the entire system.

The construction contended for by appellant is further negatived by the proviso which follows the language quoted above. Under this proviso, districts acting jointly shall not acquire electric utility distribution properties in any other public utility district without the consent of such district. This means that, in counties which have no district, or in counties in which the district, though not one of the purchasers, has given its consent, the properties may be purchased by the joint action of other districts.

Having thus given districts, acting jointly, this broad power to acquire integrated electric properties extending beyond the boundaries of the purchasing districts, any purpose of the legislature to limit such acquisitions in the manner suggested ought to have been expressly stated. It may be as appellant contends, that the authority which § 2 of chapter 227 confers upon districts will make it possible for several of them, acting jointly, to become a "public power czar." This, however, is a political question which should be directed to the legislature, and concerning which we cannot take cognizance.

The sixth question which is presented for our consideration is whether the joint purchase agreement and joint operating agreement contemplate an unlawful delegation of the powers of the district commissioners to a consulting engineer and an executive board.

Article III of the purchase agreement provides for the employment of an independent consulting engineer for the purpose of providing immediate and continuous "engineering counsel" in the operation of the joint system. Article III further provides that the consulting engineer shall prescribe the form of annual budgets to be adopted for the joint system, and an effective procedure for the control of expenditures under such budget. It is further provided that the consulting engineer shall make inventories of the properties and prepare valuations, establish the basis for the plant account records, and prepare and file periodic reports

or surveys with respect to management, operation, maintenance, rates, sufficiency of power supply, and necessity for capital improvements.

Article II, § 2.2, of the purchase agreement provides that the consulting engineer shall certify the additional amounts to be added to the agreed purchase price by reason of net capital additions after June 30, 1952. The five districts agree to pay such additional amounts on a prorated basis specified in the section. Section 2.3 of article II provides that, on the acquisition date, the consulting engineer shall certify to each of the districts the initial estimated cost of the current assets, the allocation thereof to each individual district, and each district's share in the cost of the current assets which pertain to the joint system. Each district agrees to pay the amount so certified. This section also provides for additional certifications relating to acquisition costs, to be made at stated intervals after the acquisition date.

Article V of the joint operating agreement confers additional duties upon the consulting engineer. Among other things, he is to determine the amount of production properties debt service according to a specified formula; redetermine such amount in connection with additional bond issues, and such redetermination "shall not be subject to the approval of the Executive Board"; and make similar redeterminations in the event changes occur which, in the opinion of the consulting engineer, make it necessary or desirable to redetermine such amounts. These latter redeterminations are subject to the approval of the executive board.

Article II of the joint operating agreement provides for the creation of an executive board, comprised of one commissioner from each of the five districts. The executive board is to serve as the agency of the districts in the performance of such duties as are assigned to it in the agreement, or may hereafter be assigned by the districts, in connection with the joint operation, management, improvement, and extension of the joint system. Other district commissioners are entitled to attend the meetings of the executive board, but are not permitted to vote. Any district,

however, may, by majority vote of its commissioners, bind its representative on the executive board as to how he shall cast his vote upon any item of business before the board.

Appellant contends that the provisions summarized above evidence an unlawful delegation of discretionary powers by the district commissioners to the consulting engineer and executive board. He cites no authority in support of this proposition.

 Where the enabling legislation under which a municipal or quasi-municipal corporation derives its power confides legislative or discretionary functions in particular officials or boards, such functions may not be delegated to others. 2 McQuillin on Municipal Corporations (3d ed.) 672, § 10.39; cases cited in 37 Am. Jur. 732, Municipal Corporations, § 118, note 14. Unless the enabling legislation provides otherwise, however, those in whom such functions repose may delegate to others the performance of duties of a purely ministerial or administrative nature. *Storey v. Seattle,* 124 Wash. 598, 215 Pac. 514.

 The legislative and discretionary functions essential to the operation of an individual public utility district are confided in a commission, consisting of three elected members. Laws of 1931, chapter 1, §§ 4, 6 (n). Chapter 227, Laws of 1949, contains no express provision relative to the exercise of legislative and discretionary functions in connection with the joint operation of integrated electric systems by two or more districts. However, § 2 thereof provides that any two or more public utility districts

". . . shall have the *power, by mutual agreement,* to exercise jointly all powers granted to each individual district. . . ."

Having in mind the above principle and statutory provisions, we do not believe that there has been an unlawful delegation of legislative and discretionary functions to the consulting engineer. He is given no power to make policy decisions of a legislative character. Nor is he given freedom to carry out or ignore, as his own discretion dictates, the basic policies formulated by the commissioners.

He will render consultative service and make recommendations on matters requiring engineering competence. He will perform a variety of tasks in connection with such matters as budgets, inventories, valuations, and surveys. In the making of certain certificates, he will, in a sense, be acting as an impartial fact finder as between the individual districts. In the making of certain determinations, he will be acting as a fact finder as between the districts, considered jointly, and the bondholders. In the latter capacity, his determination will, with one minor exception, be subject to approval by the executive board.

In none of these respects will the consulting engineer, in our opinion, be exercising legislative or discretionary functions which have been vested in the individual district commissions, or in all the commissions acting jointly. His duties are important, and they will require the exercise of judgment, but since they are administrative in character, there is no violation of the principle which appellant invokes.

■■■ We reach the same conclusion with regard to the executive board. This board will exercise management functions within the field assigned to it by the agreement or by the individual districts. In the exercise of such functions, each district retains full control over its own representative on the board. Municipal corporations frequently delegate management duties to an individual officer, committee, or board. Where, as here, the operation is to be the joint responsibility of several quasi-municipal corporations, the designation of a management board seems especially necessary. It is, therefore, an arrangement clearly within the contemplation of the enabling legislation—chapter 227, Laws of 1949.

■■■ The seventh question which appellant brings before us is whether certain commitments made by the intervener districts in connection with the proposed joint operation of hydroelectric generating units at Rock Island dam, owned by Chelan district, will constitute a loan of

credit by the intervener districts to Chelan district, in violation of Art. VIII, § 7, of the state constitution.

The constitutional provision in question reads as follows:

"No county, city, town, or other municipal corporation shall hereafter give any money, or property, or loan its money or credit, to or in aid of any individual, association, company, or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company, or corporation."

Rock Island dam is owned by Puget. In 1951, Chelan district entered into a lease and operating contract with Puget, whereby the district obtained the right to install certain additional hydroelectric generating units at the dam. In order to obtain funds for the construction of these units, Chelan district issued electric revenue bonds. The lease and operating contract, and the resolution authorizing this bond issue, contain provisions requiring an accounting of all revenues derived from these units. They also obligate Chelan district to make certain lease payments and payments for power, debt service, and other charges and expenses.

Under the terms of the purchase agreement, the five districts will acquire joint ownership of Puget's dam and other facilities at Rock Island. They will be unable, however, to acquire joint ownership of the generating units at the dam owned by Chelan district until Chelan district's outstanding revenue bonds in connection therewith have been retired. Section 2.6 of the joint purchase agreement therefore provides that, until that time arrives, these generating units will be jointly operated by the five districts, ownership to remain in Chelan district. In this connection, the five districts ratify, approve, and confirm all actions of Chelan district and Puget taken in connection with the transaction, and agree that the covenants of the lease, operating contract, and bond resolution must be fully kept and performed. This means that the revenues attributable to the generating units in question will continue to be put into certain funds of Chelan district, in accordance with the covenants to which reference has been made.

It is plain from this analysis of the proposed arrangement that there will be no loan of credit by the intervener districts to Chelan district. In effect, the five districts, as joint operators of these units, will merely be purchasing electric energy from Chelan district, at the rates specified in Chelan district's bond resolution. The purchase price for energy, so determined and paid, is to be earmarked in the manner required by Chelan district's lease and bond commitments, but there is no loan by the intervener districts of their own credit to meet Chelan district's obligations.

The eighth and final question raised by appellant's assignments of error involves the validity of certain provisions of the purchase agreement relating to Puget's employees.

Article 20 (a) of the purchase agreement provides that the five districts shall employ for at least two years, subject to certain exceptions, all persons employed by Puget on the closing date of the agreement. Under article 20 (b), the five districts, respectively, agree to become qualified as employers under the state employees' retirement system. In this connection, they also agree to perform all conditions which, under chapter 274, Laws of 1947, as amended, are necessary in order that the services of such employees performed for Puget up to the date of acquisition shall be credited to the employees upon the same basis as if the services had been rendered to the districts. Among other things, this would require a contribution of approximately one million dollars, to be paid by the five districts to the retirement system over a period of ten years.

Section 2, chapter 227, Laws of 1949, authorizes districts to expend money for the purpose of acquiring jointly all or any part of certain electric utility properties. Appellant contends that the required one-million-dollar contribution to the retirement system is not for the purchase of electric utility properties. On the contrary, he urges, it is, in effect, a payment for work performed by such employees for Puget prior to the acquisition. On the basis of this reasoning, it is argued that the five districts are without authority to make such payment.

In agreeing to this arrangement, the five districts derive their authority, not from chapter 227, Laws of 1949, but from § 4 (b), chapter 50, Laws of 1951, p. 126 [*cf.* RCW 41.40-.160 (2)]. The latter statute pertains to the retention of employees of a public utility company by an acquiring public agency, and expressly authorizes the arrangement set out in article 20 (b) of the purchase agreement.

*Amici curiae* argue that if § 4 (b), *supra,* is to be so applied, it violates Art. VIII, § 7, of the state constitution. This argument was not advanced before the trial court (nor by appellant on this appeal), and therefore may not now provide a basis for reversing the judgment. Accordingly, we do not discuss this contention.

 Article 21 of the purchase agreement provides that the obligation of the five districts to complete the purchase is subject to the condition that, on or before the closing date, Puget will set aside $2,250,000, in trust or otherwise, to the end that proper provision be made for payment of pensions and separation allowances. It is further provided that, after the purposes for which this amount is set aside have been accomplished, any part of such amount no longer necessary for such purposes shall be paid over ratably to the districts or their assigns.

Appellant argues that this $2,250,000 fund is being paid by the districts and not by Puget, else it would not have been necessary to mention it in the agreement. As a further indication of this, he cites the trial court's conclusion of law to the effect that the unused balance of this fund would operate as a contingent reduction of the purchase price. Appellant takes the position that the $2,250,000 is being paid by the districts for the unauthorized purpose of paying certain pensions and separation allowances to Puget employees who have not been and never will be employed by the five districts.

Respondents deny that this $2,250,000 is to be paid by the five districts rather than Puget. Assuming, however, that it is to be paid by the districts, we are of the view that the districts are authorized to make such payment. Puget is

not obliged to sell its properties to the five districts. If they are to acquire these facilities by purchase, they must, as in the case of any sale, meet the terms insisted upon by the seller. This $2,250,000 payment to Puget, for the purpose of enabling the latter to pay separation allowances and pensions to Puget employees not to be employed by the districts, is one of the terms upon which Puget insisted. Upon analysis, therefore, the payment of this sum is but a part of the total purchase price for the properties being acquired. It is therefore authorized by chapter 227, Laws of 1949.

*Amici curiae*.raise one additional question which we will consider, as it goes to the jurisdiction of the court.

It is their contention that the declaratory provision of the judgment should be set aside, because the attorney general was not served and did not appear. In this connection, they invoke § 11 of the uniform declaratory judgments act, which reads in part as follows:

"If the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general shall also be served with a copy of the proceeding and be entitled to be heard." RCW 7.24.110, Rem. Rev. Stat. (Sup.), § 784-11.

In his complaint, appellant asked not only for an injunction, but also for a declaratory judgment to the effect that chapter 227, Laws of 1949, is unconstitutional. Not having served a copy of the complaint upon the attorney general, as required by the foregoing statute, appellant did not invoke the jurisdiction of the court in so far as declaratory relief is concerned. *Parr v. Seattle*, 197 Wash. 53, 84 P. (2d) 375. Lack of jurisdiction to enter the declaratory portion of the judgment does not, however, affect the validity of the portion dismissing the complaint. See *Manlove v. Johnson*, 198 Wash. 280, 88 P. (2d) 397.

Had the trial court declared the act unconstitutional, it would be necessary to remand with directions to modify the judgment by deleting such declaration. See *Manlove v. Johnson, supra*. Since, however, the declaration is to the effect that the act is valid and constitutional, it adds nothing of substance to the relief granted. The con-

stitutionality of the act was at issue in connection with appellant's request for injunctive relief. Therefore, the provision of the judgment which calls for dismissal of the action has implicit within it a conclusion of law to the effect that chapter 227, Laws of 1949, is valid and constitutional. It is accordingly unnecessary to remand the judgment for modification.

The judgment is affirmed.

GRADY, C. J., MALLERY, DONWORTH, and FINLEY, JJ., concur.

WEAVER, J. (concurring in the result)—I expressed my views on the applicability of Art. II, § 38, of the constitution to the "enrolled bill" rule in a concurring opinion in *Derby Club v. Becket,* 41 Wn. (2d) 869, 252 P. (2d) 259. However, a majority of the court is not in favor of discarding the rule. Accordingly, I concur in the result reached by the majority.

SCHWELLENBACH, J. (dissenting)—I agree that the three branches of our government, the executive, the legislative, and the judicial, are each separate and distinct from the other. Nevertheless, they are interdependent upon each other, and all three, functioning together, constitute the state government.

The constitution placed upon the legislative branch the duty of enacting laws. However, it also placed certain restrictions upon the legislature, as to how and in what manner such laws could be enacted.

Art. II, § 19, provides:

"BILL TO CONTAIN ONE SUBJECT.—No bill shall embrace more than one subject, and that shall be expressed in the title."

Art. II, § 37, provides:

"REVISION OR AMENDMENT.—No act shall ever be revised or amended by mere reference to its title, but the act revised or the section amended shall be set forth at full length."

Art. II, § 38, provides:

"LIMITATION ON AMENDMENTS.—No amendment to any bill shall be allowed which shall change the scope and object of the bill."

An examination of the legislative history clearly reveals that the above constitutional restrictions were ignored and violated in enacting this legislation.

The legislature has no right to violate those positive constitutional restrictions, and then say to the court, whose duty it is to determine whether or not an act is constitutional, "You cannot go behind an enrolled bill and consider the legislative history of an act for the purpose of determining whether or not we violated any constitutional provisions." By drawing such an iron curtain around its transactions, the legislature is usurping the functions of the judiciary and is preventing it from properly performing the duties placed upon it by the constitution. As was so ably stated by Chief Justice Murray, in *Fowler v. Peirce,* 2 Cal. 165 (despite the criticism of Professor Wigmore):

" . . . and our constitution has wisely so distributed the powers of government, as to make one a check upon the other, thereby preventing one branch from strengthening itself both at the expense of the co-ordinate branches, and of the public."

I believe that *State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac. 201, and all kindred cases should be overruled, in order that the judiciary may be restored to its proper place and exercise its functions as a co-ordinate branch of the government.

HILL, J. (dissenting)—In my opinion, the act in question violates at least two constitutional provisions:

Art. II, § 19. My reasons are fully stated in the dissent in *Casco Co. v. P. U. D. No. 1 of Thurston County,* 37 Wn. (2d) 777, 226 P. (2d) 235.

Art. II, § 38. We should go behind the enrolled bill in this case, on the basis of the reasons suggested by the concurring opinions in *Derby Club v. Becket,* 41 Wn. (2d) 869, 252 P. (2d) 259, and by Judge Schwellenbach's dissent in this case.

OLSON, J., concurs with HILL, J.