105 P.3d 9 (2005)
153 Wash.2d 475
WASHINGTON STATE GRANGE, Terry Hunt, Jane Hodde, Senator Tim Sheldon, Senator Joyce Mulliken, Senator Darlene Fairley, and Representative Fred Jarrett, Petitioners,
v.
Gary LOCKE, in his official capacity as Washington State Governor, Sam Reed, in his official capacity as Washington State Secretary of State, and Michael Murphy, in his official capacity as Washington State Treasurer, Respondents.
No. 75384-9.
Supreme Court of Washington, En Banc.
Argued June 10, 2004.
Decided January 20, 2005.
*11 James Martin Johnson, Olympia, for Petitioners.
Governor Gary Locke, Washington State Governor, Treasurer Michael Murphy, State Treasurer, Narda D. Pierce, Attorney General, Solicitor General, Thomas C. Morrill, Attorney General's Office, Secretary Sam Reed, Secretary of State, Olympia, Daniel Benjamin Ritter, Harry J.F. Korrell, Davis Wright Tremaine, LLP, Michele G. Radosevich, Seattle, for Respondents.
David Thomas McDonald, Jonathan Hart Harrison, Preston Gates & Ellis LLP, Seattle, for Amicus Curiae Paul Berendt and Washington State Democratic Party.
BRIDGE, J.
In 2003, the Ninth Circuit Court of Appeals held that Washington's blanket primary system was unconstitutional.[1] As a result, the Washington legislature was required to enact a new system for conducting primary elections in Washington, and during the 2004 session, the legislature responded by enacting Engrossed Senate Bill 6453 (ESB 6453), adopting the "Louisiana style" or "top two" primary system in Washington. ESB 6453 also allowed for implementation of a "Montana style" primary system as an alternative, should the Louisiana system be overturned by the courts.[2] Governor Locke then vetoed *12 the sections of the bill enacting the Louisiana system, leaving the Montana system in place. Petitioners, including the Washington State Grange, two voters, and four legislators, filed an original action in this court challenging the validity of both the portion of the legislation allowing for the Montana system and the governor's veto. This court granted review to determine whether ESB 6453 or the final legislation, either because of the governor's veto or due to flaws in the legislative enactment process, violated article III, section 12 (governor's veto powers), article II, section 19 (single subject and subject in title rules), or article II, section 38 (limitation on amendments) of the Washington Constitution. On June 10, 2004, this court heard oral argument in this case. We then issued an order denying the writ requested by the petitioners. This opinion explains that decision.
We hold that the governor acted within the power granted to him under the article III, section 12 veto power when he vetoed several numbered sections of ESB 6453. We also conclude that for the purposes of an article II, section 19 analysis, we must consider what a legislator or citizen would understand the title of a bill to mean upon reading that title for the first time, and that to do so, we must look to the common and ordinary meaning of the terms used in the title, rather than the meaning assigned to those terms in the text of the bill. The common and ordinary meaning of the title of ESB 6453, "AN ACT Relating to a qualifying primary," encompasses both a Louisiana style top two primary system and a Montana style primary system because either system qualifies candidates to appear on the general election ballot. E.S.B. 6453, 58th Leg., Reg. Sess. (Wash.2004). As a result, we hold that ESB 6453's bill title was adequate at all stages of the legislative process and no violation of article II, section 19 occurred. Finally, we hold that amendments that were adopted during the legislative process did not violate article II, section 38 of the Washington Constitution.

I

Facts and Procedural History
Since 1935, Washington has conducted "blanket" primaries, under which primary voters have been permitted to vote for the candidate of their choice for each office, regardless of the candidate's political affiliation and without the voter being required to declare affiliation with any political party. Democratic Party of Wash. State v. Reed, 343 F.3d 1198, 1201 (9th Cir.2003), cert. denied, 540 U.S. 1213, 124 S.Ct. 1412, 158 L.Ed.2d 140 and ___ U.S. ___, 124 S.Ct. 1663, 158 L.Ed.2d 392 (2004). The top vote getting candidate from each party has then advanced to the general election. In 2000, the United States Supreme Court declared a similar California system to be unconstitutional because it violated the political parties' First Amendment right of association. Cal. Democratic Party v. Jones, 530 U.S. 567, 575, 577, 586, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). Subsequently, the democratic, republican, and libertarian parties in Washington challenged Washington's blanket primary system, claiming that it too violated their freedom of association. Democratic Party of Wash. State, 343 F.3d at 1201. In 2003, the Ninth Circuit held that Washington's blanket primary system was indeed unconstitutional and the United States Supreme Court refused to review that decision. Id. at 1204, 1207. The federal courts have enjoined Washington from using the blanket primary in future elections. U.S. Dist. Ct. Order of Clarification at 1, Wash. State Democratic Party v. Reed, No. C00-5419FDB (May 10, 2004). Therefore, the 2004 legislature was faced with the task of developing a new primary system for Washington State.
*13 In response to this dilemma, Bill 6453 was introduced in the Washington Senate. Statement of Agreed Facts (SAF) at 3. The original title of the bill was "AN ACT Relating to the modified blanket primary." S.B. 6453, 58th Leg., Reg. Sess. (Wash.2004). The original bill provided only for a "Louisiana style" or "top two" primary system. The full Senate considered Senate Bill 6453 on March 2, 2004, and amended the bill by adopting Senate Amendment 757. SAF at 3. The Senate Amendment changed the title of the act to "An Act Relating to a qualifying primary." See E.S.B. 6453; S. AMD. 757, § 1. Under the resulting Engrossed Senate Bill, primary elections would not function as a procedure to determine the nominees of political parties, but would instead qualify candidates for the general election ballot. E.S.B. 6453, § 1(2). Candidates would be allowed to identify a political party preference, but only in order to provide voters with a brief description of the candidate's political philosophy. Id. Each voter, regardless of party affiliation, would be able to vote for any candidate listed on the ballot and the two candidates who received the most votes (the top two vote getters) would advance to the general election so long as they received at least one percent of the total votes cast for that office. Id. The Senate concluded that "[n]o registered voter of the state of Washington should be required to divulge to any public or private entity his or her party affiliation, if any, as a prerequisite to voting." E.S.B. 6453, § 1(3)(c). In sum, under ESB 6453,
"Primary" means a statutory qualifying procedure in which each registered voter eligible to vote in the district or jurisdiction is permitted to cast a vote for his or her preferred candidate for each office appearing on the ballot, without any limitation based on party preference or affiliation on the part of the voter or the candidate, with the result that not more than two candidates for each office qualify to appear on the general election ballot.
E.S.B. 6453, § 5. Finally, the Senate included an emergency clause, indicating that the legislation would take effect immediately. S. AMD. 757, § 60; E.S.B. 6453, § 205. The Senate passed ESB 6453 by a vote of 28 to 20 and the bill was sent to the House. SAF at 3.
On March 8, 2004, the House of Representatives considered ESB 6453 and amended it. See H. AMD. 1184. The House amendment added a second part to the legislation (sections 101-193) establishing the "Montana style" primary as an alternative to the Louisiana top two primary, should the Louisiana primary be struck down by any court of competent jurisdiction. H. AMD. 1184, § 101; E.S.B. 6453, § 101.
The amendment declared that the Montana primary was intended to protect the general election ballot for minor party and independent candidates and to maintain the candidate's right to self-identify with any major political party, while preserving voter privacy and rejecting mandatory voter registration by political party. E.S.B. 6453, § 140. Under the Montana system, major political party[3] candidates for most partisan elected offices[4] would be nominated by way of a primary election using one of two possible ballot formats. E.S.B. 6453, § 139. The consolidated ballot format requires a voter to check a box to indicate the major political party for which he or she chooses to vote. E.S.B. 6453, § 126. Checking the box of a particular party would allow a voter to vote for primary candidates of that party, but not of the other major party or parties. E.S.B. 6453, § 142(1). A primary vote would not be *14 tabulated if the voter either checked more than one party box or failed to check a party box at all. Id. Under the alternative, physically separate ballot format, a voter would receive several ballots, one for each major political party and one nonpartisan ballot. E.S.B. 6453, § 142(2). The voter would choose which party's ballot to vote but could not vote on more than one party ballot. Id. A voter who did not choose to vote any major party ballot would be left to vote only the nonpartisan offices on the nonpartisan ballot in the primary election. See id. Under either ballot format, no minor party or independent candidate would appear on the primary ballot.
Under ESB 6453's Montana option, no record would be created identifying which party a voter chose to vote, and under no circumstances would an individual be required to affiliate with or declare a preference for a political party upon registering to vote. E.S.B. 6453, §§ 107-108. Though minor party and independent candidates would be excluded from the primary ballots, they would be eligible to participate in the general election if nominated by convention. E.S.B. 6453, § 110(1). To be valid, a convention must be attended by at least 100 Washington registered voters, and candidates for United States president, vice president, senator, representative, or any statewide office must be nominated by signatures from at least one thousand registered Washington voters. E.S.B. 6453, § 111. For other offices, one hundred signatures of voters in the jurisdiction of the office must be obtained. Id.
In sum, after the House amendments were added, ESB 6453 contained two parts. Part 1 (sections 1-57) provided for the Louisiana top two primary. Part 2 (sections 102-193) provided for the alternative Montana primary, should a court strike down the top two primary system. The House amendments also amended the emergency clause so that it would apply to the entire legislation except sections 102 through 193, the part referring to the Montana system. E.S.B. 6453, § 205. The House passed ESB 6453 as amended by a margin of 51 to 46. SAF at 3. On March 10, 2004, the Senate voted to concur with the House amendment adding the Montana primary alternative by a margin of 36 to 12. Id.
On April 1, 2004, the governor vetoed Part 1 of the bill, the part enacting the Louisiana top two style system. Veto Message (VM) on S.B. 6453, at 1; E.S.B. 6453, §§ 1-57. He also vetoed sections 101 and 201, which established the Montana primary as an alternative only if the Louisiana top two system should be struck down by a court. VM at 1; E.S.B. 6453, §§ 101, 201. The result was that the remaining, postveto legislation enacted only the Montana style primary.
In his veto message, referring to the Montana primary as the" `open primary/private choice' system" and the Louisiana top two primary as the "`modified blanket primary,'" Governor Locke explained that the legislature knowingly forwarded him two options, and he chose the Montana system over the Louisiana top two system. VM at 1-2. Governor Locke gave several reasons for his decision. Because the level of participation is almost twice as high in general elections as it is in primary elections, the governor sought to provide broader voter choice in the general election by choosing the system that allowed for more candidates in the general election. VM at 2. In addition, he worried that the top two primary system would result in instances where two candidates of the same party would advance to the general election, disenfranchising voters of other parties. Id. He also expressed concern that the top two primary system would effectively deny minority and independent candidates access to the general election ballot because those candidates would almost never be one of the top two vote getters in a primary election. Id. The governor predicted that the top two system would "almost certainly result in major parties nominating their candidates through caucuses and embroiling the state in lengthy litigation over the use of party labels by candidates who have not been nominated according to party rules." Id. Finally, he speculated that the political parties would promptly block the top two primary in federal court. Id. at 3. Therefore, he vetoed the sections establishing the top two primary, leaving the Montana primary system in its place. Id. at 4.
*15 In his veto message, the governor also discussed section 205 of ESB 6453, which provides that "[e]xcept for sections 102 through 193 of this act [providing for the Montana style alternative], this act is necessary for the immediate preservation of the public peace, health, or safety, or support of the state government and its existing public institutions, and takes effect immediately." E.S.B. 6453, § 205. The governor, however, opined that any newly established primary system should be subject to an emergency clause:
The emergency declaration in section 205 applies in these circumstances to the entire bill as I have signed it into law. Any other reading would thwart the manifest purpose of the Legislature and lead to an absurd result. Obviously, the reference to sections 102 through 193 was intended only to apply if the bill signed into law had multiple inconsistent primary systems. With my veto action, however, this is not the case.
VM at 4. Even so, the governor chose not to veto section 205 because he wanted to avoid ambiguity as to whether an emergency need for a primary system exists. Id.
Although the legislature could have reconvened upon a two-thirds vote of both houses in order to reconsider vetoed sections of the bill, it did not do so. CONST. art. III, § 12. Because the legislature did not override the governor's veto, ESB 6453, as altered by the governor's vetoes, became Laws of 2004, chapter 271 (chapter 271).
The Washington State Grange, two individual voters, and four state legislators filed an original action in this court under article IV, section 4 of the Washington Constitution. They asked that this court issue a writ of mandamus directing the secretary of state and the governor to conduct the 2004 primary election in accordance with ESB 6453 as passed by the legislature. In the alternative, they sought a writ compelling the secretary of state and the governor to conduct the 2004 election in accordance with preexisting primary laws, striking only the provision of preexisting law requiring a blanket primary. Specifically, the petitioners argued that chapter 271 or its enactment process violated three provisions of the Washington Constitution: article III, section 12 (governor's veto powers), article II, section 19 (single subject and subject in title), and article II, section 38 (limitation on amendments).[5] On June 10, 2004, we heard oral argument on these issues, and on the same day this court issued an order denying the writ. This opinion explains that decision.

II

Analysis
This court reviews the constitutionality of legislation de novo. See Pierce County v. State, 150 Wash.2d 422, 430, 78 P.3d 640 (2003). The party asserting that an act violates the state constitution "`bears the heavy burden of establishing its unconstitutionality beyond a reasonable doubt;'" any reasonable doubts are resolved in favor of constitutionality. Id. at 430, 78 P.3d 640 (quoting Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000)); Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 631, 71 P.3d 644 (2003).

A. Article III, Section 12  Governor's Veto Power
This court has held that in approving or disapproving legislation, the governor acts in a legislative capacity. Hallin v. Trent, 94 Wash.2d 671, 677, 619 P.2d 357 (1980); Wash. Ass'n of Apartment Ass'ns v. Evans, 88 Wash.2d 563, 565, 564 P.2d 788 (1977). Before the adoption of the 62nd Amendment to the Washington Constitution in 1974, article III, section 12 provided that if presented with a bill containing more than one section or item, the governor could veto "one or more sections or items while approving other portions of the bill." Former CONST. art. III, § 12 (1889) (emphasis added). Historically, governors generally vetoed entire bills, entire numbered sections, or entire appropriation *16 items. Wash. State Motorcycle Dealers Ass'n v. State, 111 Wash.2d 667, 671, 763 P.2d 442 (1988). However, in the 1950s, 1960s, and early 1970s, governors increasingly vetoed items that were less than entire sections of nonappropriation bills. Id. at 671-72, 763 P.2d 442. In response, the voters approved what became Amendment 62 to the Washington Constitution. Id. at 672-73, 763 P.2d 442. The amendment provided that when presented with a bill containing more than one section or appropriation item, the governor may:
object to one or more sections or appropriation items while approving other portions of the bill: Provided, That he may not object to less than an entire section, except that if the section contain one or more appropriation items he may object to any such appropriation item or items.
CONST. art. III, § 12 (amend.62) (emphasis added). The amendment permitted the governor to veto sections of a bill but limited the use of the item veto to appropriation bills and expressly prohibited the partial veto of anything less than "`an entire section'" of a nonappropriation bill. Motorcycle Dealers, 111 Wash.2d at 673, 763 P.2d 442. The amendment also provided the legislature with new authority to reconvene itself by a two-thirds vote in each house within 45 days of the end of the session, in order to override gubernatorial vetoes. CONST. art. III, § 12 (amend.62); id. at 673-74, 763 P.2d 442.
Prior to the 62nd Amendment, this court applied two tests to evaluate the validity of vetoes, the affirmative-negative test and the separate subject test. Under the affirmative-negative test, if the veto amounted to destructive or negative action preventing some provision from becoming law, then the veto was permissible, but if the veto improperly added "a new or different result from that which the Legislature intended," the veto was improper. Motorcycle Dealers, 111 Wash.2d at 676, 763 P.2d 442. Under the separate subject test, this court would uphold a veto of a portion of a nonappropriation bill, regardless of the numbered sections created by the legislature, if "the portion vetoed contained separate, distinct and independent subject matter." Id. at 677, 763 P.2d 442. Yet after the 62nd Amendment, this court abandoned both tests because they proved to be "subjective, unworkable and ... no one could safely predict whether any given partial veto would be upheld or struck down." Id. at 676-77, 763 P.2d 442. Instead, the Motorcycle Dealers court concluded, based on the plain language of the 62nd Amendment, that "gubernatorial vetoes of less than entire sections of nonappropriation bills are void." Id. at 670, 674, 763 P.2d 442.
Then in 1997, in Washington State Legislature v. Lowry, 131 Wash.2d 309, 931 P.2d 885 (1997), this court retreated from the bright line rule set forth in Motorcycle Dealers and allowed the veto of subsections of a nonappropriation bill. Id. at 317, 321, 931 P.2d 885. The Lowry court recognized the historic creativity of both the legislature and the governor in dealing with the veto power, id. at 317, 931 P.2d 885, and distinguished Motorcycle Dealers on the grounds that, unlike the Lowry court, the Motorcycle Dealers court had not been "confronted with a case of legislative manipulation" intended to frustrate the exercise of the gubernatorial veto. Id. at 319, 931 P.2d 885. The Lowry court explained:
We decline to abandon our constitutional responsibility to referee disputes between the branches. If the Court withdraws from the fray, the delicate constitutional balance the Framers erected and the people amended between the executive and legislative branches with respect to the veto power is upset. If this Court declines to exercise its constitutional responsibility to define a "section" to which the Governor's veto applies, it entrusts the sectional veto to the sole discretion of the Legislature, a result the Framers clearly did not intend. Our constitution condones neither artful legislative drafting nor crafty gubernatorial vetoes. We must carry out our mandate as the Supreme Court of Washington to decide whether legislative designation of sections is true to the spirit of the constitution.
Id. at 320, 931 P.2d 885. Thus, when discussing the proper definition of "section," this court has indicated that it will intervene to prevent obvious circumvention of the veto *17 power by the legislature or equally obvious manipulation of that power by the governor. Id. at 320-21, 931 P.2d 885 (noting that the court was correct to hold in Washington Ass'n of Apartment Ass'ns, 88 Wash.2d 563, 564 P.2d 788, that the governor manipulated the pre-Amendment 62 item veto power when he used that power to completely rewrite portions of the legislation). Yet, the Lowry court was clear that we should interfere "[o]nly rarely, and reluctantly" "to ensure that neither the Legislature nor the Governor will so conduct its affairs ... [such] that the coordinate branch of government is substantially deprived of the fair opportunity to exercise its constitutional prerogatives as to legislation." 131 Wash.2d at 320-21, 931 P.2d 885.
The Grange argues that the governor's veto in this case is unconstitutional under article III, section 12. First, the Grange seems to argue that the governor improperly vetoed something less than an "entire section." See Pet'rs' Reply Br. at 6; CONST. art. III, § 12. While the governor vetoed less than an entire part of ESB 6453 when he vetoed sections 101 and 201, his veto erased only whole sections of the bill. The Grange points to no instance in which this court has overturned a veto of a numbered section because the other numbered sections in that part of the bill were left untouched. See, e.g., Lowry, 131 Wash.2d at 321, 931 P.2d 885 (upholding vetoes of subsections of a numbered section); Wash. Fed'n of State Employees, AFL-CIO v. State, 101 Wash.2d 536, 538, 544, 682 P.2d 869 (1984), (upholding veto of a single numbered section). The plain language of article III, section 12 clearly allows the governor to veto entire sections of nonappropriation bills.
In addition, the Grange contends that the governor improperly attempted to rewrite section 205 of ESB 6453 (the emergency clause), an action that falls outside the governor's veto power and amounts to the type of manipulation that the Lowry court declared would require intervention from this court. Furthermore, the Grange seems to assert that this attempt to rewrite section 205 renders the governor's entire veto message, including all vetoes of any section of ESB 6453, void.
While the governor stated that the "emergency declaration in section 205 applies in these circumstances to the entire bill as I have signed it into law," we understand the governor's message to be an explanation of what he interpreted section 205 to mean. VM at 4. He agreed that a new primary system is necessary for the immediate preservation of the public peace, health, or safety, and the support of the state government and its existing public institutions. Id. He also noted the risk that delay could lead to the complete absence of a partisan primary election in 2004. Id. The governor expressly declined to veto section 205 because to do so might risk ambiguity as to whether an emergency need for the primary exists at all. Id. at 4. The Grange has not shown that the governor intended to do anything more than to express his opinion, admittedly rather forcefully, as to the interpretation of section 205. The expression of such an opinion is within the governor's prerogative; in fact, Washington courts have looked to the governor's interpretation of legislation as an element of legislative history when interpreting statutes. See, e.g., Rozner v. City of Bellevue, 116 Wash.2d 342, 349, 804 P.2d 24 (1991); State v. Sell, 110 Wash.App. 741, 745-46, 43 P.3d 1246 (2002). Therefore, we conclude that the governor did not rewrite or redraft section 205, but instead expressed his opinion as to the proper interpretation of that section, something that he clearly has the power to do in the context of a veto message. See CONST. art. III, § 12; Cascade Tel. Co. v. State Tax Comm'n, 176 Wash. 616, 621, 30 P.2d 976 (1934) (explaining that the giving of a reason by the governor is for the information of the legislature only).[6] In sum, the Grange has not shown *18 that the governor's veto in this case violated article III, section 12.[7]

B. Article II, Section 19  Subject in Title Rule
Article II, section 19 of the Washington Constitution provides that "[n]o bill shall embrace more than one subject, and that shall be expressed in the title." One purpose of article II, section 19 is to prevent the practice of combining two bills, neither of which would pass on its own, but when the proponents of the measures combine their interests both can be enacted. See Pierce County, 150 Wash.2d at 430, 78 P.3d 640; (citing Power, Inc. v. Huntley, 39 Wash.2d 191, 198-99, 235 P.2d 173 (1951)). Another closely related purpose is to prevent the attachment of an unpopular bill to a popular one on an unrelated subject in order to guarantee the passage of the unpopular provision. Pierce County, 150 Wash.2d at 429-30, 78 P.3d 640. Finally, the purpose behind the subject in title rule is to guarantee that the members of the legislature and the public are given notice of the subject matter of a bill. Id. at 430, 78 P.3d 640; Amalgamated Transit, 142 Wash.2d at 207, 11 P.3d 762. The Grange argues that after the governor's veto, the subject of chapter 271, namely implementation of the Montana primary system, is not reflected in the title, "AN ACT Relating to a qualifying primary." E.S.B. 6453.
A title complies with the subject in title rule if it provides "notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law." Young Men's Christian Ass'n v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963). As explained in more detail below, this court has evaluated the sufficiency of the titles of both initiatives and bills by considering the meaning that the title would convey to the typical reader. Then the court determines whether the contents of the text of the legislation are reflected in the title.
Construction of a Bill Title for the Purposes of Article II, Section 19: The full title of chapter 271 is "AN ACT Relating to a qualifying primary; [amending, adding new sections to, or repealing more than 100 sections of Title 29A RCW]; prescribing penalties; providing a contingent effective date; and declaring an emergency." Laws of 2004, ch. 271. Here, the Grange and the secretary of state argue that the meaning of the term "qualifying primary" as used in the title is governed by the technical definition of the term as articulated in the text of ESB 6453. In contrast, the governor contends that the meaning of the title is determined by evaluating the common and ordinary meaning of the words in the title, without reference to the text of the enactment.
In both Petroleum Lease Properties Co. v. Huse, 195 Wash. 254, 257-58, 80 P.2d 774 (1938) and DeCano v. State, 7 Wash.2d 613, 623-24, 110 P.2d 627 (1941), this court construed the title of an act according to the common and ordinary meaning of the terms therein and then compared the subject expressed in the title with the contents of the act.[8] The Petroleum Lease court considered the meaning of the term "security," while the DeCano court considered the meaning of the word "alien." Petroleum Lease, 195 Wash. at 257-58, 80 P.2d 774; DeCano, 7 Wash.2d at 623-24, 110 P.2d 627. The Petroleum Lease and DeCano courts both recognized that:
"[w]ords in a title must be taken in their common and ordinary meanings, and the legislature cannot in the body of an act impose another or unusual meaning upon a term used in the title without disclosing such special meaning therein."
*19 Petroleum Lease, 195 Wash. at 261, 80 P.2d 774 (emphasis added) (quoting 59 C.J. Statutes § 390 (1932)); DeCano, 7 Wash.2d at 626, 110 P.2d 627. The Petroleum Lease court looked to the "meaning of the word `security' as that term is commonly understood and defined by standard dictionaries" and the prior statute's definition of the term. Petroleum Lease, 195 Wash. at 258, 80 P.2d 774. The DeCano court found that the title in that case gave no intimation that
the body of the act contains an amended definition of the word `alien' which brings within its purview a whole new class of persons who are not in fact aliens in common understanding, by judicial construction, or under the express definition contained in the prior law.
DeCano, 7 Wash.2d at 624, 110 P.2d 627.[9]
This court has applied a similar analysis in recent cases. In Washington Federation of State Employees v. State, 127 Wash.2d 544, 556, 901 P.2d 1028 (1995), we again articulated the test for determining whether the subject of an act is reflected in its title. First, "[u]nder Const. art. II, § 19, the title is construed with reference to the language used in the title." Id. (emphasis added) (citing Great N. Ry. Co. v. Cohn, 3 Wash.2d 672, 680, 101 P.2d 985 (1940)) ("[T]he title must be construed with reference to the language used in the title only and not in the light of the context of the act." (emphasis added)). Then, the court must "examine[ ] the body of the act to determine whether the title reflects the subject matter of the act." Washington Fed'n, 127 Wash.2d at 556, 901 P.2d 1028. As recently as 2003 we reiterated that this is the proper analysis for determining whether a subject in title violation has occurred. Citizens, 149 Wash.2d at 632, 71 P.3d 644.[10]
In addition, in Amalgamated Transit, one issue raised was whether the title of ballot initiative I-695 adequately reflected the subject of the initiative. 142 Wash.2d at 192, 11 P.3d 762. This court first discussed the meaning of the term "tax" as defined in the text of I-695 and then compared that definition to the common and ordinary meaning of "tax" as used in the title; we transposed the order of the discussion, but the analysis remained the same. Id. at 218-20, 222-23, 11 P.3d 762; see also id. at 192, 11 P.3d 762. The term "tax" was defined, for the purposes of application of I-695, in the text of the initiative itself. Id. at 218-19, 11 P.3d 762. Once it had established the meaning of the term "tax" as defined in the text of I-695, the court's ultimate inquiry was "whether, for purposes of the article II, section 19 subject-in-title rule, the term `tax' has a broader meaning than its commonly understood, traditional meaning." Id. at 223, 11 P.3d 762. The court concluded that the I-695 definition was broader than the common and ordinary meaning of the term. Id. at 226, 11 P.3d 762. Therefore, the title of the initiative did not adequately reflect the contents of the initiative. See id. at 225-26, 11 P.3d 762.
[W]e affirm the trial court's holding that I-695 violates the subject-in-title rule of article II, section 19 on the basis that the ballot title of I-695 states "[s]hall voter approval be required for any tax increase" *20 without any indication in the title that "tax" has a meaning broader than its common meaning. Nothing about this ballot title gives any notice that would indicate to the voters that the contents of the initiative would include voter approval for charges other than taxes or suggest inquiry into the act be made to learn the broad meaning of "tax."
Id. at 227, 11 P.3d 762 (footnote omitted). Thus, after comparing the common and ordinary meaning of the word "tax," to the broader meaning assigned to the term in the text of the initiative, id. at 220, 222, 225-27, 11 P.3d 762, the court concluded that the ballot title was misleading because the average voter would not anticipate the broader application of the initiative to fees that ordinarily fell outside of the definition of a tax. Id. at 192, 11 P.3d 762.
In sum, when evaluating the sufficiency of a title under article II, section 19, this court has consistently construed the title according to the common and ordinary meaning of its language. The court then compares the title to the text of the enactment to determine whether a subject in title violation exists. Neither the Grange, nor the secretary of state has pointed to a case in which this court has looked to the definition of a term contained in the text of the enactment to construe the title, and we decline to do so in this case.[11] The Grange's repeated references to the text of ESB 6453 and its legislative history are irrelevant to the construction of the title of the legislation. The text of the bill is only relevant insofar as we must examine the contents of the bill in order to discern whether its subject is adequately reflected in the title.
An Act Relating to a Qualifying Primary: Following established precedent to this case, we must first look to the common and ordinary meaning of "AN ACT Relating to a qualifying primary" by referring to a dictionary definition of the title's terms. E.S.B. 6453; see Salts v. Estes, 133 Wash.2d 160, 167, 943 P.2d 275 (1997). Webster's Third New International Dictionary defines "qualify" as "to reduce from a general undefined, or comprehensive to a particular or restricted form." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1858 (2002). The American Heritage Dictionary includes in its definition of "qualify," "[t]o reach the later stages of a selection process or contest by competing successfully in earlier rounds." THE AMERICAN HERITAGE DICTIONARY 1479 (3d ed.1992). "Primary" or "primary election" has been defined as "an election in which qualified voters nominate or express a preference for a particular candidate or group of candidates for political office, choose party officials, or select delegates for a party convention," WEBSTER'S, supra, at 1800, and "[a] preliminary election in which voters nominate party candidates for office," AMERICAN HERITAGE, supra, 1438. Thus, the common and ordinary meaning of the term "qualifying primary" is an election in which the list of potential candidates for an office is reduced or refined and certain candidates are chosen to advance to the later general election.
The governor notes that during the House and Senate floor debates, the legislators did not refer to the Louisiana top two primary system as the "qualifying primary." Instead, they referred generally to the Louisiana, Cajun, or top two system. See Transcript (Mar. 8, 2004) at 2, 4, 6; Transcript (Mar. 10, 2004) at 1, 2, 3. In fact, Senator Kastama noted that both systems "qualify candidates for the general election." Transcript (Mar. 10, 2004) at 2. While we cannot glean the thinking of the entire legislature from the comments of a few members, it is interesting to note that the term "qualifying primary" was not commonly used among the legislators during debate to refer to the top two system. See *21 Lowry, 131 Wash.2d at 326-27, 931 P.2d 885 (listing cases).
In sum, Washington case law directs that we must construe the words in the title of ESB 6453 and chapter 271 according to their common and ordinary meaning, rather than according to the definition assigned to them in the text of the bill. Under the common and ordinary meaning of the words, "AN ACT Relating to a qualifying primary" refers to an election in which the list of potential candidates for an office is reduced or refined and certain candidates are chosen to advance to the general election. Therefore, the generic subject reflected in this title is the adoption of a primary system that qualifies candidates for the general election ballot.[12] The title is a general one and "`any subject reasonably germane to such title may be embraced within the body of the bill.'" Citizens, 149 Wash.2d at 633, 71 P.3d 644 (quoting DeCano, 7 Wash.2d at 627, 110 P.2d 627).
Adequacy of the Title of ESB 6453: The second clause of article II, section 19 requires that the subject of a bill must be expressed in its title. The subject in title requirement is to be liberally construed in favor of the constitutionality of the legislation. Pierce County, 150 Wash.2d at 436, 78 P.3d 640. "Any '"objections to the title must be grave and the conflict between it and the constitution palpable before we will hold an act unconstitutional."'" Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 372, 70 P.3d 920 (2003) (quoting Nat'l Ass'n of Creditors v. Brown, 147 Wash. 1, 3, 264 P. 1005 (1928) (quoting N. Cedar Co. v. French, 131 Wash. 394, 419, 230 P. 837 (1924))). To be constitutionally adequate, a title need not be "an index to the contents [of the bill], nor must it provide details of the measure." Amalgamated Transit, 142 Wash.2d at 217, 11 P.3d 762. The title satisfies the subject in title requirement "if it gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law." Young Men's Christian Ass'n, 62 Wash.2d at 506, 383 P.2d 497. The purpose is "to inform voters and members of the legislature on the subject matter of the measure they are voting on." Neighborhood Stores, 149 Wash.2d at 371, 70 P.3d 920. "`[A]ny subject reasonably germane to [a general] title may be embraced within the body of the bill.'" Citizens, 149 Wash.2d at 633, 71 P.3d 644 (quoting DeCano, 7 Wash.2d at 627, 110 P.2d 627).
In this case, ESB 6453 as passed by the legislature created a Louisiana top two primary system, but it also allowed for a Montana style system should the Louisiana system be declared invalid. After the governor's veto, the resulting legislation, chapter 271, created only a Montana style primary system. The Grange seems to argue both that ESB 6453 as passed by the legislature and chapter 271 as signed by the governor violated article II, section 19 because the Montana style primary was not a qualifying primary and thus it was never encompassed within the bill title.
However, we conclude that because a Montana system is an option that would qualify candidates for the general election ballot, the Montana style primary system is reasonably germane to the bill title as construed in the prior section of this opinion. The title does not provide details of the chosen system, but it need not do so. See Amalgamated Transit, 142 Wash.2d at 217, 11 P.3d 762. The title would lead a reader to inquire into the body of the act to learn the details of the proposed system. See Young Men's Christian Ass'n, 62 Wash.2d at 506, 383 P.2d 497. A voter or a legislator reading the title of chapter 271 for the first time, without any knowledge of the contents of the *22 act, would be reasonably informed as to the subject matter of the act.[13]
While the parties disagree as to which version of the legislation we should apply the subject in title analysis  the bill as passed by the legislature or the bill as signed by the governor  the result is the same in either case. Because the title reflects the generic subject of the adoption of a primary system that qualifies candidates for the general election ballot, it would easily encompass both primary system alternatives. Thus, we need not decide today at what stages of the legislative process article II, section 19 applies. We conclude that neither ESB 6453 as passed by the legislature nor chapter 271 as signed by the governor violates the subject in title provision of article II, section 19.[14]

C. Article II, section 38  Limitation on Amendments
Article II, section 38 of the Washington Constitution provides that "[n]o amendment to any bill shall be allowed which shall change the scope and object of the bill." Although the Grange claims that ESB 6453 violated article II, section 38, there is very little discussion of the provision in the Grange's briefs and instead, the Grange focuses on article II, section 19. Because the Grange has provided no substantive discussion to support its claim regarding article II, section 38, we conclude that the Grange has not shown beyond a reasonable doubt that this provision was violated. See Pierce County, 150 Wash.2d at 430, 78 P.3d 640.
Furthermore, article II, section 38 governs legislative actions and the Grange has pointed to no case in which the provision has been applied to a governor's veto. In fact, this court has insisted upon application of the "enrolled bill rule" in any article II, section 38 analysis. The enrolled bill rule forbids an inquiry into the legislative procedures preceding the enactment of a statute that is "properly signed and fair upon its face." Schwarz v. State, 85 Wash.2d 171, 175, 531 P.2d 1280 (1975).
"Finding an enrolled bill in the office of the secretary of state, unless that bill carries its death warrant in its hand, the courts will make no investigation of the antecedent history connected with its passage, except as such an investigation may be necessary in case of ambiguity in the bill for the purpose of determining the legislative intent."
State ex rel. Wash. Toll Bridge Auth. v. Yelle, 61 Wash.2d 28, 34, 377 P.2d 466 (1962) (quoting State ex rel. Dunbar v. State Bd. of Equalization, 140 Wash. 433, 443, 249 P. 996 (1926)). The court "will not go behind an enrolled enactment to determine the method, the procedure, the means, or the manner by which it was passed in the houses of the legislature" perhaps even in the case of a flagrant violation of article II, section 38. Derby Club, Inc. v. Becket, 41 Wash.2d 869, 882, 252 P.2d 259 (1953) (Hill, J., concurring).
The legal theory upon which the enrolled bill rule rests is that the legislature is a coordinate branch of government, in no way *23 inferior to the judicial branch, and thus its final record of the enactment "imports absolute verity." Roehl v. Pub. Util. Dist. No. 1, 43 Wash.2d 214, 222, 261 P.2d 92 (1953). Internal legislative procedures provide a mechanism for legislators to object to an amendment based on article II, section 38 concerns. See PERMANENT RULES OF THE SENATE, 58th Leg., Rule 66 (Wash.2003-04), available at http://leg.wa.gov/senate/sadm/ senate_rules.htm# rule66; PERMANENT RULES OF THE HOUSE OF REPRESENTATIVES, 58th Leg., Rule 11E (Wash.2003-04), available at http://www.leg.wa.gov/house/ hadm/rules.htm # anchor11; Fed'n of State Employees, 127 Wash.2d at 570 n. 5, 901 P.2d 1028 (Talmadge, J., concurring/dissenting) (describing the "Cherberg Rule" on scope and object). Thus, we will not look to legislative history of a statute in order to determine whether an amendment changed the scope and object of the original bill. Roehl, 43 Wash.2d at 219, 225, 261 P.2d 92. Nothing on the face of chapter 271, as interpreted above, indicates that an article II, section 38 violation occurred here.[15] Therefore, we conclude that neither the House amendment nor the governor's veto violated article II, section 38.
In sum, we conclude that the governor's exercise of his veto power did not violate article III, section 12, neither chapter 271 nor ESB 6453 violates article II, section 19's subject in title restriction, and the Grange has not shown beyond a reasonable doubt that article II, section 38 was violated.

III

Conclusion
Neither chapter 271 nor ESB 6453 violates any of the constitutional provisions at issue in this case. The governor did not act outside his veto power when he vetoed entire sections of ESB 6453 and thus there was no violation of article III, section 12. The court must construe the title of an enactment according to the common and ordinary meaning of the terms therein, and given the common and ordinary meaning of the language in the title "AN ACT Relating to a qualifying primary," the title is general, and the Montana style nominating primary system fits within the subject matter expressed in the title. E.S.B. 6453. There is no article II, section 19 violation. Finally, the Grange has not shown beyond a reasonable doubt that the legislature violated article II, section 38. The writ is denied.
ALEXANDER, C.J., C. JOHNSON, MADSEN, CHAMBERS, OWENS, FAIRHURST, JJ., and IRELAND, J. Pro Tem., concur.
SANDERS, J. (dissenting).
The majority upholds Governor Locke's partial veto of Engrossed Senate Bill (ESB) 6453, majority at 12, which created a new primary voting system after Washington's blanket primary was struck down in federal court, see Democratic Party of Washington State v. Reed, 343 F.3d 1198 (9th Cir.2003). I dissent because the post-veto bill title now violates the subject-in-title rule expressed in article II, section 19 of the Washington Constitution [1] as construed in Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762, 27 P.3d 608 (2000).
A bill's subject must be expressed in its title. Const. art. II, § 19. "[A] title complies with the constitution if it gives notice that would lead to an inquiry into the body of the act, or indicate to an inquiring mind the scope and purpose of the law." Young Men's Christian Ass'n v. State, 62 Wash.2d 504, 506, 383 P.2d 497 (1963). A title is either *24 general or restrictive. Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 368, 70 P.3d 920 (2003). "`A general title is broad, comprehensive, and generic as opposed to a restrictive title that is specific and narrow.'" Id. at 368, 70 P.3d 920 (quoting City of Burien v. Kiga, 144 Wash.2d 819, 825, 31 P.3d 659 (2001)). A restrictive title "is one where a particular part or branch of a subject is carved out and selected as the subject of the legislation." Gruen v. State Tax Comm'n, 35 Wash.2d 1, 23, 211 P.2d 651 (1949), overruled in part on other grounds by State ex rel. Wash. State Fin. Comm. v. Martin, 62 Wash.2d 645, 384 P.2d 833 (1963). If the title is restrictive, the "constitutionally permissible scope is more limited." Wash. Ass'n of Neighborhood Stores, 149 Wash.2d at 368, 70 P.3d 920. "[A restrictive title] will not be regarded so liberally, and provisions which are not fairly within it will not be given force." State v. Thorne, 129 Wash.2d 736, 758, 921 P.2d 514 (1996).
The title of ESB 6453 reads in relevant part: "AN ACT Relating to a qualifying primary." Laws of 2004, ch. 271. This title is restrictive, limiting the bill to a specific subject, namely qualifying primaries. We have considered similarly specific bill titles restrictive. See State v. Broadaway, 133 Wash.2d 118, 127 n. 2, 942 P.2d 363 (1997) (listing examples of restrictive titles). The majority, however, asserts ESB 6453's title is "general," encompassing any content "`reasonably germane'" to it. Majority at 21 (quoting Citizens for Responsible Wildlife Mgmt. v. State, 149 Wash.2d 622, 633, 71 P.3d 644 (2003)).
The court must first construe the title according to its language and then examine that title in reference to the bill's contents to determine if the two accurately match. Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 556, 901 P.2d 1028 (1995). The majority emphasizes the importance of using the ordinary meaning of words when construing the title. It utilizes the dictionary definition of "qualify" [2] and "primary or primary election," [3] and then combines the two definitions to arrive at the "common and ordinary meaning" of "qualifying primary." Majority at 20-21. The majority's resulting amalgamated definition is: "an election in which the list of potential candidates for an office is reduced or refined and certain candidates are chosen to advance to the later general election." Id. at 20. In substance this definition is really no different from the majority's definition of "primary election," rendering the modifier "qualifying" entirely superfluous.
A better approach is to define the words in context, thereby providing effect and meaning to each word used in the title. See Amalgamated Transit, 142 Wash.2d at 220, 11 P.3d 762 ("All language in a piece of legislation should be given effect, so that no provision is rendered superfluous.") (citations omitted).
If a primary is an election in which voters choose which candidates advance to the general election, then a "qualifying primary" must be a certain kind of primary. The phrase describes a particular system in which a group of candidates is narrowed to two finalists without regard to party. However, a "nominating primary" is very different.[4] This is a system in which voters choose or nominate the parties' candidates for the general election. These definitions distinguish between the two kinds of primaries giving meaning to each word. The majority's approach avoids a distinction which the legislature chose to make through the use of specific words. The bill makes the critical legislative distinction between a "qualifying" primary (as originally intended) and a "nominating" primary which is all that is left after the veto.
*25 ESB 6453 as passed by the legislature created a "qualifying" or "top two" primary, in which the top two candidates in any race advance to the general election regardless of party affiliation. This system is distinct from a "nominating" system in which voters choose the parties' nominees for the general election.[5]
The legislature defined the difference between a "qualifying" or top two primary and a "nominating" primary. The senate entitled the top two primary bill as "AN ACT Relating to a qualifying primary." Statement of Agreed Facts (SAF) Ex. 4, at 1. The house then amended the bill to include two sections. The original senate top two primary section was entitled a "qualifying" primary, whereas the alternate party nomination section was denominated a "nominating" primary. Each system fell under a subtitle with the appropriate name, whereas the entire bill was titled, "AN ACT Relating to a qualifying primary." (emphasis added).
The house amendment made the nominating primary an alternative to the qualifying primary only if it was judicially invalidated. The pertinent section provides:
If a court of competent jurisdiction holds that a candidate may not identify a major or minor political party as best approximating his or her political philosophy ... the secretary of state shall notify the governor [and others] that the state can no longer conduct a qualifying primary and instead will conduct a nominating primary.
SAF Ex. 5, at 2 (emphasis added). These words are purposeful legislative terms describing two distinct primary systems; however, the majority transposes the legislative terms, standing legislative intent on its head.
ESB 6453 as passed by the legislature created a qualifying primary with a contingent nominating primary alternative in case the qualifying primary was found invalid. The act's title matched its contents perfectly. However, when Governor Locke vetoed the qualifying primary system, the remainder created a nominating system notwithstanding a title which identified the previously rejected alternative. Assuming the validity of the governor's veto the bill was thereby forced into violation of article II, section 19 since its title did not describe but was contrary to its substance. No amount of wordplay can escape this self-evident conclusion. A qualifying primary is fundamentally distinct from a nominating primary.
The distinction between the two primary systems is of Grand Canyon-esque proportions compared to the majority's razor thin line in Amalgamated Transit. There the majority argued at length that "tax" as used in I-695's title did not fairly describe "any monetary charge by government," and therefore the title violated the subject-in-title rule. 142 Wash.2d at 226, 11 P.3d 762.[6] I posit that if an initiative is unconstitutional under the subject in title rule because voters might be misled by a broad definition of "tax," then surely enacting the opposite system from the one described in ESB 6453's title obviously violates the same rule. The majority would *26 do well to remember its own exhortation: "A court should `not strain to interpret [a] statute as constitutional: a plain reading must make the interpretation reasonable.'" Amalgamated Transit, 142 Wash.2d at 225, 11 P.3d 762 (alteration in original) (quoting Soundgarden v. Eikenberry, 123 Wash.2d 750, 757, 871 P.2d 1050 (1994)). Here a "reasonable interpretation" requires us, as did the legislature, to differentiate between a "qualifying" primary and a "nominating" primary, recognizing the difference.
The governor's veto reversed the subject of the bill without changing its title. The veto caused ESB 6453 to violate the subject-in-title rule of article II, section 19, making the bill unconstitutional and invalid.
I dissent.
NOTES
[1] Democratic Party of Wash. State v. Reed, 343 F.3d 1198, 1204, 1207 (9th Cir.2003), cert. denied, 540 U.S. 1213, 124 S.Ct. 1412, 158 L.Ed.2d 140 and ___ U.S. ___, 124 S.Ct. 1663, 158 L.Ed.2d 392 (2004).
[2] A Louisiana style primary does not require voters to affiliate with any particular political party. Each voter can vote for any primary candidate for each position, regardless of either the candidate's or the voter's party preference. For example, a voter may vote for a republican candidate for attorney general but a democratic candidate for governor. Only the top two vote getting candidates, regardless of party, advance to the general election.

A Montana style primary requires each primary voter to choose among major party ballots; the voter's choice is limited to primary candidates appearing on the major party ballot that the voter has chosen. One candidate from each major party advances to the general election ballot. Unlike the Louisiana system, minor party and independent candidates can be nominated and placed on the general election ballot by convention. Thus, more than two candidates can advance to the general election as a result of the Montana style primary.
While these terms are imprecise, they have been used by both legislators and the parties in this case to distinguish between the two types of primary systems at issue here. We too use these terms for ease of discussion regarding the two systems.
[3] For the purposes of Part 2 of ESB 6453, a major political party is defined as:

[A] political party of which at least one nominee for president, vice president, United States senator, or a statewide office received at least five percent of the total vote cast at the last preceding state general election in an even-numbered year.... However, a political party of which no nominee received at least ten percent of the total vote cast may forgo its status as a major political party.
E.S.B. 6453, § 103.
[4] This does not include the offices of United States president, vice president, precinct committee officers, and offices exempted from the primary requirement. E.S.B. 6453, § 139. In addition, the Montana system does not apply to nonpartisan elections, including but not limited to the election of the superintendent of public instruction and judicial offices. E.S.B. 6453, §§ 170, 173, 174.
[5] While the petitioners raised other arguments, this court limited review to whether ESB 6453, either because of the governor's veto or because of flaws in the legislative enactment process, violates any of the constitutional provisions listed above.
[6] Even if this court were to interpret the veto message as an attempt to redraft section 205, such a conclusion does not lead to the drastic remedy suggested by the Grange, namely the voiding of the governor's vetoes in their entirety. The Grange has not pointed to a single instance in which this court has invalidated all of a governor's vetoes in their entirety based only upon the impropriety of the governor's action with regard to a single section. In fact, in Motorcycle Dealers, the court voided some of the governor's vetoes, but not all. 111 Wash.2d at 681, 763 P.2d 442.
[7] The Grange also suggests that the governor attempted to leverage his veto power by waiting until the last available day to act and argues that this somehow violated article III, section 12. However, it was well within the governor's power to do so.
[8] The Grange cites to Shelton Hotel Co. v. Bates, 4 Wash.2d 498, 104 P.2d 478 (1940), to support its contention that the court must look to the text of the legislation and its legislative history to construe a bill title. However, Shelton Hotel clearly addresses the interpretation of the text of a statute itself, not the construction of words used in the title of a piece of legislation. Id. at 501, 104 P.2d 478. Several cases involving the construction of titles are more helpful here.
[9] These cases may suggest that if the act in question is amendatory in nature, then the court may consider prior legislative definitions of a term or prior judicial construction of a term, in addition to the common and ordinary meaning of a term. See Petroleum Lease, 195 Wash. at 258, 80 P.2d 774 (referring to term as defined in original act); DeCano, 7 Wash.2d at 624, 110 P.2d 627 (referring to common understanding, judicial construction, or express definition in prior law). However, there is no prior statutory definition of "qualifying primary." In addition, while both the secretary of state and the dissent hint that the legislature drew the term "qualifying primary" from the United States Supreme Court decision in California Democratic Party, 530 U.S. at 585-86, 120 S.Ct. 2402, the term actually adopted by the United States Supreme Court in that case was "nonpartisan blanket primary." The Grange, the secretary of state, and the dissent are unable to point to a judicially created definition of "qualifying primary."
[10] The dissent admits that we "must first construe [a bill] title according to its language." Dissent at 24. But instead of looking to the plain and ordinary meaning of the terms in the title as required by precedent from this court, the dissent, like the Grange and the secretary of state, attempts to define "qualifying" by looking to the text of the bill. Notably the dissent fails to cite to any instance in which this court has looked to the definition of a term contained in the text of an enactment to construe its title. See dissent at 24.
[11] The Grange also seems to argue that because the House amendment adding the Montana alternative was voted on in the Senate on a particularly busy day, senators would have actually been misled by the title referring to a qualifying primary. However, this court has held that the enrolled bill doctrine forbids us from inquiring into whether the legislature would have actually been misled by an amendment that changes the text but not the title of a bill. See Brower v. State, 137 Wash.2d 44, 71, 969 P.2d 42 (1998) ("[T]he enrolled bill doctrine forbids an inquiry into whether the Legislature might have been misled by a continued reference in the title to material deleted from the act."); see also Amalgamated Transit, 142 Wash.2d at 212 n. 5, 11 P.3d 762 (refusing to consider evidence of whether logrolling actually occurred). See also infra, Part II.C.
[12] We may construe a title to reflect a generic subject not specifically stated in the title. See Wash. Ass'n of Neighborhood Stores v. State, 149 Wash.2d 359, 369, 70 P.3d 920 (2003) ("we look to whether the ballot title suggests a general, overarching subject matter for the [legislation]"); see also Citizens, 149 Wash.2d at 632, 636, 71 P.3d 644; City of Burien v. Kiga, 144 Wash.2d 819, 825, 31 P.3d 659 (2001); Amalgamated Transit, 142 Wash.2d at 215-16, 11 P.3d 762 (noting that we have named "`openness in government'" and "`persistent offenders'" to be generic subjects reflected in titles even where those words did not appear in the relevant titles (quoting Fritz v. Gorton, 83 Wash.2d 275, 290-91, 517 P.2d 911 (1974) and State v. Thorne, 129 Wash.2d 736, 758, 921 P.2d 514 (1996))).
[13] The dissent asserts that the result in this case should be the same as the result in Amalgamated Transit. Dissent at 25-26. While we adopt the Amalgamated Transit analysis for determining whether a title violates the subject in title rule, the application of that analysis yields a different result in this case. In Amalgamated Transit, the common and ordinary meaning of the term "tax" in the ballot title was not broad enough to encompass the technical definition assigned to the term in the initiative text. More fees were impacted than the initiative title led voters to believe, creating a subject in title violation. See Amalgamated Transit, 142 Wash.2d at 191-92, 11 P.3d 762. Here, the common and ordinary meaning of the term "qualifying primary" is broad enough to encompass the Montana style system because a Montana system is an option that would qualify candidates for the general election ballot. The dissent fails to recognize this critical distinction. See dissent at 25-26.
[14] Single Subject Rule: While the Grange clearly argues that ESB 6453 violates the subject in title requirement of article II, section 19, the Grange does not expressly contend that the enactment violates the single subject rule. In its brief, the Grange refers to analyses traditionally connected with the single subject rule, including discussion of general versus restrictive title and the concept of rational unity. See Pet'rs' Op. Br. at 46. Yet while the Grange explicitly refers to the subject in title rule several times, it does not state that ESB 6453 contained two unrelated subjects. Given the petitioner's heavy burden to show unconstitutionality beyond a reasonable doubt, we conclude that the Grange has not shown that ESB 6453 violated the single subject rule.
[15] Rather than relying on the enrolled bill rule, the Court of Appeals recently undertook the task of evaluating whether an amendment violated article II, section 38. In re Pers. Restraint of Metcalf, 92 Wash.App. 165, 184, 963 P.2d 911 (1998). The court noted that the scope of a bill refers to the bill's ultimate intention, while the object of a bill can be defined as its aim, purpose, or goal. Id. (citing Fed'n of State Employees, 127 Wash.2d at 570 n. 5, 901 P.2d 1028 (Talmadge, J., concurring/dissenting)). Even if we were to ignore the enrolled bill rule here, neither the House amendment nor the governor's veto changed the ultimate object of ESB 6453, namely the creation of a constitutionally permissible primary system.
[1] "No bill shall embrace more than one subject, and that shall be expressed in the title." Const. art. II, § 19.
[2] Qualify: "to reduce from a general, undefined, or comprehensive to a particular or restricted form." Webster's Third New International Dictionary 1858 (2002).
[3] Primary election: "an election in which qualified voters nominate or express a preference for a particular candidate or group of candidates for political office, choose party officials, or select delegates for a party convention." Id. at 1800.
[4] Nominate: "to propose, select, or formally enter by any of various methods (as the caucus, the convention, the primary, or petition) as a candidate for public office. Id. at 1534.
[5] Justice Scalia distinguished these systems, showing how a "nonpartisan blanket primary" does not infringe upon political parties' First Amendment rights:

Generally speaking, under such a system, the State determines what qualifications it requires for a candidate to have a place on the primary ballot  which may include nomination by established parties and voter-petition requirements for independent candidates. Each voter, regardless of party affiliation, may then vote for any candidate, and the top two vote getters (or however many the State prescribes) then move on to the general election. This system has all the characteristics of the partisan blanket primary, save the constitutionally crucial one: Primary voters are not choosing a party's nominee.
Cal. Democratic Party v. Jones, 530 U.S. 567, 585-86, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000). Justice Scalia's description of the "nonpartisan blanket primary" exactly describes the "qualifying primary" created by ESB 6453 as passed by the legislature. This system qualifies the field of candidates by winnowing the number; only the two most successful candidates continue regardless of party affiliation.
[6] In Amalgamated Transit the majority chose a very narrow and precise definition of "tax" and passed it off as the common and ordinary meaning, see 142 Wash.2d at 219-26, 11 P.3d 762, rejecting other common definitions of "tax" that included the scope of I-695's use of the term. See id. at 268-71, 11 P.3d 762 (Sanders, J., dissenting).